## The Raleigh.[1]

Mudgett v. The Raleigh.   Ward v. Same.   Wilder v. Same.

(*District Court, S. D. New York.*   October 26, 1887.)

1. Maritime Lien—Sale of Vessel by Master—Transfer of Lien to Proceeds—Discharge of Vessel.

It is well settled that, if a sale by the master is warranted by the existing circumstances of the ship, and is made *bona fide*, any prior lien upon her is transferred to the proceeds only, and the vessel cannot be held liable in the hands of a purchaser.

2. Same — Sale of Wrecked Vessel—Allegations of Fraud—Opinion of Experts as to Advisability of Sale.

Where the steam-ship R. was driven ashore, and filled with water and running ice, and the testimony indicated that she was regarded as a total wreck, not only by the master, but by agents and surveyors of the underwriters and others, and in that condition she was sold by the master, *held*, that the circumstances did not establish fraud in the sale; and that the vessel, as afterwards repaired, was not liable for supplies furnished prior to the accident.

3. Same—Agent of Vessel—Advances—Presumption as to Lien.

A ship's husband, or her general agent, presumptively has no lien for advances made to discharge the obligations of the vessel.

4. Same—Evidence of Agreement for.

M. & Co. were general agents of the steam-ship R., though they had not exclusive control of her. An action was brought by them against the vessel to recover advances made to her. There was no proof of any agreement that they should have a lien on the vessel, or any circumstances indicating an hypothecation of the ship in their favor. *Held*, on the evidence, that they had no lien, and could not recover.

*Henry D. Hotchkiss*, for libelants Mudgett and Wilder.

*A. H. Alker*, for libelant Ward.

*Owen & Gray*, for claimants.

Brown, J.   The libelants claim a lien upon the Raleigh for advances and supplies furnished by them respectively on account of the steamship during the year 1885 and January, 1886. On the twentieth of January, 1886, while the steamer was on a voyage from Baltimore to New York, she was driven ashore by ice in the Chesapeake bay, and afterwards abandoned and sold under the master's authority. One Petze, the claimant, became the purchaser. He subsequently raised and repaired her at an expense of about $11,000, about a year before the above libels were filed.

It is well settled that, if a sale by the master is warranted by the existing circumstances of the ship, and was made *bona fide*, any prior lien upon her would be transferred to the proceeds only; and that the vessel could not be held liable in the hands of the purchaser. The libelants contend that the circumstances of this case did not justify a sale; and, *secondly*, that the sale itself was fraudulent, and made in bad faith, and for the benefit of the master, who, it is claimed, became interested in

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

the purchase. The claimant denies the latter charges, and further contends that the demand of Mudgett & Co. was never a lien upon the vessel, because their advances were made by them as the ship's agents in the city of New York.

The vessel was owned by a corporation in Boston, and was its only property. Captain Littlefield had been for several years the general manager of the company, and also master of the vessel. Mudgett & Co. had been the general agents of the ship in New York for several years in obtaining charters, collecting the freights, paying bills, procuring insurance, making entry, etc.; all, however, subject to the direction and control of Captain Littlefield, who was the general superintendent of the corporation and the master of the ship, who signed all charters, and occasionally collected some of the freights due.

It is well settled that a ship's husband or her general agent is not presumptively entitled to any lien upon a vessel for advances made to discharge her obligations. His business and the object of his employment by the owner, are presumptively to facilitate the ship in the transaction of her business, and to free her from charges; not to preserve incumbrances on her. Presumptively, he deals upon the credit of the owners; and he has no lien for his advances unless there is some agreement to that effect, or the circumstances show that such must be deemed to have been the reasonable intent of the parties. When such an agent pays the ship's obligations on the application of the master or the owners, the presumption is that he does so, not as a stranger, but as the agent of the ship and her owners, and upon the personal credit of the latter, or of the future business and earning of the ship. The J. C. Williams, 15 Fed. Rep. 558, and cases there cited; White v. Americus, 19 Fed. Rep. 848; The Esteban de Antunano, 31 Fed. Rep. 920.

This presumption, I think, applies equally to the facts of the present case, although Mudgett & Co. had not the exclusive control of the ship, as general agents often have where no owner, or general superintendent of the owners, is present. There is no proof of any agreement for a lien in favor of Mudgett and Co., nor do I find any circumstances indicating any hypothecation of the ship in their favor. They were in the habit of remitting to the owners the balances of freight due them; and the fair inference of fact from the testimony and the circumstances is that they looked for reimbursement to the future earnings of the vessel, and not to any lien upon the ship.

Upon the foregoing grounds, I feel constrained to decide that the libelants first named had no lien. In the last two cases the demands were undoubtedly liens upon the vessel at the time the supplies were furnished, and the claims in those cases are sufficient to raise the question secondly above referred to.

The very clear weight of testimony seems to me to show beyond doubt that, when the steamer was driven ashore and filled with water and running ice, she was regarded as a substantial wreck, not only by the master, but by the agents and surveyors of the underwriters and by others who examined her at the time, and who had no possible interest to report

otherwise than in accordance with their honest judgment upon the examination of the condition of the vessel. The insurers, though reinsured, paid the loss after a few days upon their surveyor's report of a total loss. There are doubtless circumstances in evidence calculated to raise some suspicion; but, taking the evidence altogether, I must hold these circumstances wholly insufficient to establish any fraud in the sale; or to show that the master, prior to the sale, had any knowledge or belief that the vessel was not a substantial wreck. The fact that it subsequently appeared that the ship was not injured so much as was supposed, does not prove fraud, or bad faith, nor tend to invalidate the sale. *The Amelie*, 6 Wall. 18; *The Sarah Ann*, 13 Pet. 387. The sum required to raise the ship was large. In her apparent condition as a wreck, it was the master's duty to do with her the best he could, and to act upon the best judgment that could be formed at the time. Nearly all the contemporaneous evidence sustains the master's judgment in ordering the sale, as the only thing practicable. There is no proof of the market value of the vessel as she lay sunk; nor that, when repaired, she was worth more than the cost of raising and repairing her. The evidence, therefore, does not even show that the master's judgment was erroneous; much less that the sale was fraudulent. The libels must, therefore, all be dismissed, with costs.