## THE TRADER.

## THE CAPITAL CITY.

### (District Court, D. Washington, W. D.   April 6, 1904.)

1. **COLLISION — STEAM VESSELS MEETING — NEGLIGENCE AND VIOLATION OF RULES.**

    A collision occurred in Puget Sound shortly after dark, off Dash Point, four miles north of Tacoma, between the steamer Capital City, proceeding from Tacoma at a speed of 12 miles, and the British steamer Trader, coming southward at a speed of 5½ miles. The night was dark but calm, with no fog, and the lights could readily be seen. As the Capital City came out past Brown's Point, being then on a crossing course and showing her green light to the Trader, the latter, then a mile distant, gave a signal of two blasts for passing starboard to starboard, which was not answered. The Capital City then swung to the starboard so as to pass a quarter of a mile off Dash Point, and for five minutes the vessels approached each other head on. When half a mile apart the Trader repeated her signal for a starboard passing, which was assented to, but the Capital City proceeded without changing course or speed until immediately before collision, when, without signal, she ported her helm and swung to starboard across the course of the Trader, which immediately reversed, but too late to avoid the collision. *Held*, that both vessels were in fault; the Trader for signaling while the other vessel was coming around the point and before she had settled on her course, and persisting in such signal contrary to the rules while they were approaching head on, and for not sooner stopping and giving alarm signals when the Capital City was seen to be coming on at full speed without changing her course; the Capital City for inattention to the meeting vessel, for failing to act on the signal after acceding to it, and, finally, for taking the contrary course without notice, making the collision inevitable.

2. **SAME—ISSUES IN SUIT—CONSOLIDATION OF CAUSES.**

    The failure of a petition for limitation of liability on account of collision to set out the grounds on which exemption from liability is claimed, as required by admiralty rule 56, when it is intended to contest such liability, cannot be taken advantage of by the adverse parties, where by stipulation such proceedings have been consolidated with cross-suits between the two vessels, in which the question of liability has been put in issue by the pleadings.

3. **SAME—FAILURE OF MASTER TO STAND BY AFTER COLLISION—EVIDENCE CONSIDERED.**

    The failure of the captain of one of two vessels, both of which were seriously injured in a collision, to stand by after the other had been

¶ 1. Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

beached, or to take off her passengers, was not a violation of Act Sept. 4, 1890, c. 875, 26 Stat. 425 [U. S. Comp. St. 1901, p. 2902], which rendered his vessel liable for the collision, where it was calm and there was little danger to the passengers, and the extent of the injury to his own vessel was unknown, and where, after proceeding to port only four miles distant, he at once gave notice and himself returned with a tug, and all the passengers and crew were safely taken off.

**4. SAME—ASSIGNMENT OF CLAIMS—SUIT BY VOLUNTEER.**
     A mere volunteer to whom claims for damages by collision have been assigned solely for the purpose of suit, and who has no interest therein, has no standing to prosecute such claims in a court of admiralty.

In Admiralty. Cross-libels to recover damages for injuries caused by a collision between the steamboat Capital City, an American vessel, owned by the S. Willey Steamship & Navigation Company, and the steamboat Trader, a British vessel, owned by C. S. Baxter and F. W. Vincent. Hearing on the merits. Both vessels found to be in fault, and damages divided.

This litigation was initiated by a suit in rem in behalf of the S. Willey Steamship & Navigation Company, owner of the steamboat Capital City, against the British steamboat Trader, registered at the port of Victoria, B. C., to recover damages for an injury to the Capital City, and for loss of cargo and baggage of passengers and personal effects of members of her crew, caused by a collision between the two vessels, which occurred on the 28th day of October, 1902, on Puget Sound, off Dash Point, about four miles northward from Tacoma, by which the Capital City was so badly injured that it was necessary to run her on the beach to save the lives of the passengers and crew on board. Said libel was filed the next day after the collision, while the Capital City was sunk, and supposed to be a complete wreck, and the amount of damages claimed was $40,000. After the Trader had been taken into the custody of the United States marshal, her owners appeared as claimants, and filed a petition for limitation of liability in accordance with the laws of the United States, and thereupon the Trader was appraised, and a bond for her appraised value was filed in the case, after which she was released from custody. The Capital City having been raised, and taken to a dock for repairs, an amended libel was filed, in which the amount of damages claimed was reduced to $8,500. On December 29, 1902, the owners of the Trader commenced an independent suit in rem against the Capital City to recover $5,000 damages for alleged injuries to the Trader caused by the collision. On the same day, December 29, 1902, a stipulation, signed in behalf of the respective owners of the two vessels, was filed in the suit of Baxter and Vincent against the Capital City, whereby the parties agreed as follows:

"It is hereby stipulated and agreed by and between the proctors for all parties in interest:

"First. That the causes and matters of all kinds and nature whatsoever in any wise comprised or included in the above-entitled matters shall be consolidated and by the above-entitled court heard as of one case.

"Second. That all evidence taken in any of such causes upon the behalf of any party thereto, whether heretofore appearing or hereafter to appear, shall be considered in all of said causes, and have the same force and effect, as though separately taken in each case.

"Third. That Honorable Samuel D. Bridges be appointed by the judge of the above-entitled court as court commissioner to take evidence therein, and all of the evidence heretofore taken or hereafter to be taken before said commissioner be considered as having been taken in each, every, and all of said causes.

"Fourth. That this stipulation is entered into to avoid costs, expense, and delay, and the same is considered a full and sufficient consideration and cause thereof on behalf of every party hereto, and on behalf of any party or parties hereinafter in any of these causes appearing or making claim.

"Fifth. That any party or parties claiming or pretending to claim to have any interest or right by reason of the collision of the steamers Capital City and Trader out of which the above causes arose may appear in any one of said causes, or either of them, and such appearance shall be considered an appearance in each and all thereof, one appearance only as to all of said causes from this time forth being required, and such intervening parties to have every right by reason of such appearance as though separate appearances were made in all three causes.

"Sixth. That the above-entitled court make its order, forthwith directing a monition to issue in the matter of the limitation of liability, and appointing the said Samuel Bridges as commissioner of said court to take testimony thereunder; and that thereupon the said causes proceed to a final hearing as soon as may be convenient and possible upon the part of the parties hereto.

"Seventh. That this stipulation be filed, and an order be entered accordingly, and that all parties hereafter appearing or intervening in this cause have the benefit hereof, reserving all questions under petition for limitation of liability."

On the 23d day of January, 1903, Francis Rotch appeared in the original suit, in response to the petition for limitation of liability, and filed an intervening libel to recover, on the bond filed by the owners of the Trader, the alleged value of merchandise and baggage, and personal effects of a number of shippers and passengers, and members of the crew, alleged to have been on board the Capital City, and to have been lost or damaged in consequence of the collision, and alleged that the owners thereof had assigned their claims to him.

In accordance with the stipulation above referred to, the several causes were consolidated, and evidence in behalf of each and all of the litigants has been taken and reported to the court by a commissioner appointed for that purpose.

The pleadings upon which the cause has been submitted to the court consist of the amended libel of the S. Willey Steamship & Navigation Company, the answer of Baxter and Vincent to said amended libel, the petition of Baxter and Vincent under the limited liability statutes, a claim in behalf of the original libelant in response to the petition for limitation of liability, a claim in behalf of Francis Rotch in response to said petition for limitation of liability, the libel of Baxter and Vincent against the Capital City, an answer to said libel of the owner of the Capital City, the intervening libel of Francis Rotch, and an answer to said intervening libel of Baxter and Vincent.

In this mass of pleadings there are many repetitions, but the issues are few and simple. Against the Trader, the charge is made that she was solely in fault, because (a) she did not have the regulation lights, or, if her lights were burning, they were so defective and dim as to be invisible until the two steamers approached so near to each other that the collision could not be avoided; (b) the Trader signaled for a starboard passing when the positions and courses of the two vessels were such that they should have passed port side to port side, and no signal to apprise the Capital City of her presence was given by the Trader at the proper time; (c) her commander "did not properly direct the course and movement" of the Trader. This general charge, and the specifications thereof, are all denied. Against the Capital City, it is alleged that she was solely in fault, for the reason that when the two vessels were one mile distant from each other, and in such positions that the Capital City showed only her green light and her masthead light to the Trader, a signal for a starboard passing was given by the Trader, to which the Capital City failed to make response, and later, when the distance between the two vessels was at least one-half of a mile, and the Capital City was still showing her green light, and not her red light, to the Trader, the signal for a starboard passing was repeated by two blasts of the Trader's whistle, to which the Capital City immediately responded by two blasts of her whistle, and when the vessels were very near to each other, and the Capital City running at a high rate of speed—at least 12 knots per hour—said steamer, without giving any warning of intention to change her course, suddenly turned on a port helm, in such a manner as to swing across the bow of the Trader, and the collision occurred, notwithstanding the fact that the Trader's engine was immediately

reversed, and commenced working full speed astern. This charge, and the specifications thereof, are also denied. The amounts of the losses alleged in the intervening libel of Rotch, and the several assignments to him, were put in issue by the answer to said libel.

As part of the proceedings under the petition for limitation of liability, the court appointed a commissioner to whom all claims against the Trader for damages growing out of said collision should be presented, and directed said commissioner to take evidence to prove such claims as might be presented, and to report to the court the amount of each of such claims. Said commissioner has made a report containing a schedule of claims for merchandise lost or damaged, amounting in the aggregate to $419,61, and a schedule of claims for the personal effects of employés of the Capital City, amounting in the aggregate to $410.50, and it appears from said report that the amounts claimed as set forth in said schedules were not contested, but were admitted. Said commissioner's report also shows that the claim of the S. Willey Steamship & Navigation Company, amounting to $8,500, was also presented, and it was not contested. The commissioner, however, did not assume to make any findings as to the liability of either of the parties with respect to said claims.

Richard Saxe Jones and George C. Israel, for libelant.

J. M. Ashton, for claimants.

Richard Saxe Jones, for intervening libelant.

HANFORD, District Judge (after stating the facts as above). From the evidence, I find the facts of the case to be as follows: The place of the collision was about four miles north of Tacoma, and one-fourth of a mile off shore, opposite the south side of Dash Point. There was ample room for the two vessels to have passed each other in safety, there being proximately three miles of open water between the shore of the mainland and Maury Island, and the vessels were not embarrassed by the presence of other craft. The time of the collision was about 6:20 p. m., October 28, 1902. The sky was overcast and cloudy, so that it was quite dark; otherwise it was a fine evening—that is to say, it was calm, and there was no fog or rain to obstruct the vision. The Trader was going to Tacoma, carrying a cargo of salted fish in boxes. She passed Point Robinson at about 5:30 p. m., and was then so far out towards midchannel that another steamer, going northward to Seattle, passed between her and Point Robinson. At that time the captain relieved the mate and took sole control of her movements, and changed her course so as to head south by west a quarter west by her compass. The distance from Point Robinson to Dash Point is proximately five miles, the tide was ebbing, and the Trader's speed was about 5½ statute miles per hour. At that rate of speed, with the tide against her, and on that course, in the 50 minutes which intervened between the time of passing Point Robinson and the time of the collision, the Trader would have crossed Puget Sound on an oblique line, and would have come to the place of the collision above indicated, which is proximately one-quarter of a mile off the southerly side of Dash Point.

The accompanying outline map is an accurate representation of the shore lines and points referred to and the course of the Trader, indicated by an arrow 1,000 feet off Point Robinson, and shows proximately the location of the collision, indicated by a cross one-fourth of a mile off Dash Point, and proximately the courses of the Capital City before and after turning Brown's Point.

129 F.—30

The Capital City is a passenger steamboat, and was employed on a route between Seattle, Tacoma, and Olympia. Compared with the Trader, she is a fast boat, her ordinary speed being 12½ miles per hour. She left Tacoma at 6 p. m. on her run northward to Seattle, and passed Brown's Point 15 minutes later, and then steered a course to the place of the collision above indicated, so that for a period of about 5 minutes the two steamers were on opposite courses, and approaching each other head on, or nearly so. Each of them carried the regulation masthead light and side lights, all of their lights were burning brightly,

and the three lights of each were visible to the other vessel from the time that the Capital City changed her course after turning Brown's Point, but until she changed her course only her masthead light and green light would show to the Trader. The captain of the Trader saw the masthead light and the green light of the Capital City as soon as she came out past Brown's Point, and immediately, the vessels then being distant one mile from each other, blew two blasts of the Trader's whistle, which is the signal for passing starboard to starboard, and to that signal the Capital City made no response. About two minutes afterwards, when the vessels were approaching head on, as above indicated, and showing all their lights to each other, the captain of the Trader persisted in his purpose, and repeated the signal for a starboard passing, to which the Capital City assented by an immediate response, giving two blasts of her whistle, and continued on her course, running full speed until the two vessels were very close to each other, when her captain, without having sounded an alarm, and without giving any signal other than the response to the Trader's whistle as above mentioned, changed her helm to hard aport, so that she turned quickly to starboard in a manner to bring her port side across the bow of the Trader. The captain of the Trader noticed the movement as soon as the Capital City commenced to turn, and immediately gave the signal to his engineer to reverse and work the engine full speed astern, and said order was instantly obeyed. Either the reversing of her engine or a change of her helm caused the Trader to swing to port, so that when the two vessels came together they were both turning inshore. The Trader's bow cut into the port side of the Capital City, about 30 feet abaft her stem, at an angle of about 45 degrees from the line of her keel. One of the broken timbers of the Capital City penetrated the hull of the Trader on the starboard side of her bow below the water line. Both vessels were seriously injured by the heavy jar of the impact and by the crushing of their timbers. The Capital City took in water rapidly, so that the fire in her furnace was extinguished before she struck the beach on Dash Point, less than 10 minutes after the collision. The only opening made in the hull of the Trader was partly choked by the timber which made it, so that she did not take in water to such an extent as to prevent her from completing the run to Tacoma, which she did after the Capital City had been run upon the beach. On arrival at Tacoma her captain reported the disaster, and during the evening the passenger steamer Flyer went to the relief of the Capital City and took off all of her passengers. Previous to that being done, however, the captain had returned with a steam tug to render any assistance possible.

In arriving at a conclusion with respect to the facts of the case, I have been guided mainly by the evidence of unimpeached witnesses, and by the indisputable facts with respect to the time and place of the collision. I have been obliged to reject as untrue the testimony given by the captain of the Trader, to the effect that only the green light of the Capital City was visible to him when he blew the second signal for a starboard passing. It is a peculiar feature of this case that the two captains agree in their testimony with respect to the course steered by the Capital City. Her captain puts her on a course from Brown's

Point which would show only her green light to the Trader, and the captain of that vessel swears that the Capital City did show only her green light, until she turned immediately preceding the collision.   Nevertheless, the results prove the contrary, for it is certain that, when the two steamers first came into positions to be visible from each other, the Trader was off Dash Point and the Capital City was turning Brown's Point, and it is certain that she came around that point and ran to the place where the Trader struck her, and she was stranded on Dash Point; therefore she must have run nearly a straight course from Brown's Point towards Dash Point, until she turned to starboard, only a few seconds before she was struck; whereas, if she was on a course N.⅝ W., as her captain testified, or on any course which would conceal her red light from the Trader, as she was going northward, she would have pointed across the Sound, more in the direction of the center of Maury Island than towards the place where the collision occurred, and, keeping in mind the superior speed of the Capital City, it is obvious that if she pointed to the westward sufficiently to conceal her red light from the Trader she would have made way out towards the middle of the stream so far, before she turned to starboard, that the collision could not have happened so quickly after that error as all the evidence proves, and, if the testimony of the captain of the Trader is true in respect to his own promptness in reversing and commencing to work her engine full speed astern, the collision would have been avoided.

The testimony of the captain of the Capital City is muddled and contradictory, and inconsistent with well-established facts.   He claims to have been in the pilot house, and on watch from the time his steamer left Tacoma; that he heard only one signal from the Trader; that he responded to that signal, notwithstanding the fact that he was unable to see the Trader's lights, or to locate her position, until the vessels were so near to each other that the collision could not be avoided; that at first he saw only her red light, which was four points off the Capital City's port bow; and that the two vessels were in that position (that is to say, very near to each other, and the Trader bearing four points off the Capital City's port bow, and showing only her red light) when he put his helm hard aport.   He attempts to excuse himself for not seeing the Trader's lights by saying that it was raining and the weather was thick, and yet he claims that he did see the lights on Point Robinson, more than five miles distant.   He pretends, also, that at the time of answering the signal he gave an order to the man who was steering the Capital City to change her course one point to port, and that he does not know now, and did not at the time observe, whether said order was obeyed or not; and, further, it appears by his testimony that he was first apprised of danger by hearing some one—he does not know who—say, "There is going to be a collision."   He did not then give any signal to his engineer, and attempts to excuse that failure by saying that he was standing in the pilot house in a position where he could not reach the handle of the engine-room signal bell.   If this is a true exposure of his conduct, we have an instance of a captain of a passenger steamboat, running in the nighttime at a high rate of speed, placing himself in a position where he could not communicate with his engineer, and remaining in that position after hearing a passing signal from a

steamer which he did not see nor locate, although the signal was in fact given by a steamer in dangerous proximity, when nothing intervened to obstruct his vision, and, after giving an order to his helmsman to change the course of his vessel, taking no heed to see whether the order was obeyed or not. The culmination of his extraordinary proceedings is in swearing, as a witness in this case, that when he arrived at Brown's Point he put the Capital City on a course N.⅝W., then changed the course one point more to West, and, with that steering, fetched the Trader's red light four points off the port bow of his own vessel.

It is entirely plain to me that the collision could not have happened, under the circumstances which existed, without the concurrence of negligence and mismanagement on the part of both captains. The collision did occur as a consequence of the obstinacy of a British captain in disregarding the plain mandate of the law that two steamers on opposite courses, approaching each other head to head, shall each give way sufficiently to pass each other port side to port side. The first signal for a starboard passing was given when the Capital City was at least one mile distant from the Trader, and when she was turning a point, and in this there was a violation of law—the passing signal should not be given by one vessel until the course of the other vessel has been ascertained. His error in signaling prematurely gave the captain no right whatever to insist upon passing on the starboard side, when the conditions were such as to require adherence to the rule requiring both vessels to give way to starboard so as to pass on the port side. The Capital City carried good lights, and it is reasonably certain that the captain of the Trader saw her red light before repeating the signal for a starboard passing; therefore an inexcusable fault on his part was committed in repeating that signal, and steering a course to pass on the starboard hand. If he did not see the Capital City's red light at the time of repeating the signal, he certainly was not attending to his business, and was guilty of a fault as serious as the other. The conduct of the Capital City in running at a high rate of speed so as to meet the Trader head on after she had signaled, without responding to the signal, was a sufficient indication of danger to make it the imperative duty of the captain of the Trader to stop his vessel and sound an alarm, and his failure to do so was another violation of law, and a serious fault.

The charge made against the Trader, that she did not have the regulation lights, or that, if she did have lights, they were defective, is shown to be untrue by ample evidence. The errors committed by the captain of the Capital City are glaring and inexcusable. He knew that his vessel was running at a high rate of speed, and that for safety it was necessary for him to keep a vigilant lookout, and especially so when turning Brown's Point. He either neglected that important duty, or actually saw the lights of the Trader when she was one mile distant, and made no timely effort to keep out of her way. His failure to see the Trader, if he did not see her in ample time, and his failure to keep out of her way, constitute the first fault of which I find him guilty. Having assented to the Trader's second signal for a starboard passing, he was bound to act accordingly, and should have changed the course of the Capital City by going to port, so as

to give ample room to pass clear. If he had done so, the collision would not have occurred, and his failure in this respect constitutes the second fault of which I find him guilty. If the Capital City had continued on a straight course, the Trader might have given way so as to have passed in safety; therefore the act of the captain of the Capital City in turning to starboard, suddenly, without having indicated his intention to do so by any signal, made the collision inevitable, and that act constitutes the third fault of which I find him guilty. And his failure to stop and sound an alarm when the trader gave a wrong signal for passing constitutes the fourth fault of which I find him guilty. The captain's own testimony is sufficient to condemn his seamanship, and put upon the Capital City responsibility for the collision, and I do not have to rest my decision upon the testimony of witnesses who appear to be under suspicion. I will say, however, in passing, that the man who was in the pilot house with the captain, and who steered the Capital City, and who was called first as a witness for the libelant, and afterwards was recalled as a witness for the Trader, appears to me to have been just as incompetent in the position of helmsman as he is untrustworthy as a witness. He does not know starboard from port. I am justified in saying so by the contradictions in his testimony. It is impossible to ascertain from his evidence whether he changed the helm so as to turn the vessel to starboard, or to port, after the signals were exchanged. The following quotation is taken from the cross-examination of said witness when he was giving his evidence in behalf of the libelant:

"Q. Did you get any order from the captain, from Capt. Edwards, as soon as you saw the Trader? A. He took the wheel himself to throw her hard over, and tried to clear the boat, and the other boat turned right around and hit us. Q. Oh, I see. Then, as soon as you saw the Trader, you put your helm hard aport? A. The helm hard astarboard. Q. You put your helm hard astarboard when you saw the Trader; is that right? A. I mean hard aport, to try to get away from her again, to make a starboard passing. Q. I want to know just what you do mean. When you first saw the Trader, did you put your helm hard astarboard or hard aport? A. Put the helm hard astarboard —I mean hard aport—to try to get away from him; we were making a starboard passing. Q. Then when you put your helm hard aport— A. Hard astarboard. Q. Hard astarboard. Then as a matter of fact you put your helm hard astarboard, did you? A. Yes, sir. Q. Who told you to do that? A. Well, the captain took the wheel then himself. Q. He took the lever? A. Yes, sir. Q. Well, he did not change the course any after he took it, did he? A. Well, he put the wheel hard astarboard. Q. You put it hard astarboard, and then he took the lever? A. Yes, sir. Q. Now, Mr. Simdars, why did the captain take the lever away from you? A. Well, he seen there was going to be a collision, and he tried to get out the best way he could. He took it himself to try to get out of it. Q. Did not he take your lever away from you because he told you to put your helm hard aport and you put it hard astarboard, as you testified? A. No, sir. Q. What did he say to you when he took the lever away from you? A. He did not say anything; he just— I let him have the wheel, and he took the wheel and done the best he could to try to get away from her."

In the light of such testimony, given by one of the most important witnesses for the libelant, the conclusion that the Capital City was in control of a blunderer is unavoidable, and it is useless to conjecture as to whether it was the helmsman, or the captain himself, who blundered.

The proctor for the libelant and intervening libelant has unreasona-

ably insisted upon a decree in favor of his clients for full damages on merely technical grounds, taking the position that the petition for limitation of liability filed in behalf of the owners of the Trader amounts to a confession that the Trader was in fault and liable to an amount exceeding her value, and that they should be precluded from contesting liability by reason of their failure to observe the requirements of admiralty rule 56, which prescribes that in proceedings under the limited liability statute, if the owner or owners of a vessel elect to contest his or their liability, or the liability of the vessel, independently of the limitation of liability claimed, the facts or circumstances by reason of which exemption from liability is claimed shall be stated "in his or their libel or petition." It is true that the petition for limitation of liability is defective, and if the proceedings were merely such as are contemplated by the admiralty rules, in which the issues are to be ascertained from statements of the owner's petition or libel and an answer thereto, it would be entirely fair for the court to deny the right of the petitioners to claim exemption, because their petition does not set forth the facts and circumstances relied upon as grounds for complete exemption. In this case, however, the issues which the court must adjudicate are set forth in the several pleadings which I have enumerated, and by the stipulation of the parties the several causes have been consolidated, and the court is required to adjudicate the entire controversy, and every branch of it. It is my opinion that the libelant, by said stipulation, waived whatever technical rights might otherwise have been based upon exceptions to the sufficiency of the petition for limitation of liability. In the first pleading filed by the libelant, an issue was tendered with respect to the fault of the Trader, and by the answer an issue was joined, and the same issue was raised by the libel against the Capital City, and the answer thereto, and evidence has been submitted in behalf of both parties bearing upon that issue, and from consideration of all the evidence the court has reached the conclusion, above indicated, that the collision and all consequential damages were caused by faults of the respective captains in the management of both vessels, and that the entire damages should be divided equally.

In the argument, but not in the pleadings, the Trader is charged with failure to render assistance in rescuing the passengers and crew of the Capital City, and it is insisted that under the act of Congress of September 4, 1890, c. 875, § 1, 26 U. S. Stat. 425 [U. S. Comp. St. 1901, p. 2902], the collision must be deemed to have been caused by the wrongful act, neglect, or fault of the Trader. I find, however, that she did stand by until the Capital City was beached, and then proceeded to Tacoma, and her captain was prompt in reporting the disaster, and procured a steamtug to go to the relief of the Capital City, and returned to her with said tug. Considering the comparative safety of the people on the Capital City after she was beached, and the unknown extent of the damages to the Trader, it would have been imprudent to have attempted to take the passengers on board the Trader. Therefore the statute cited is not applicable to this case.

The intervening libelant has no standing in a court of admiralty, for the reason that the evidence proves affirmatively that he has no interest in any of the matters in controversy. He paid nothing to either of the

owners of merchandise or baggage alleged to have been lost or damaged, and the several assignments of claims alleged in his libel were intended to give only color of a right to sue for damages. Courts of admiralty do not encourage litigation by mere volunteers. The Prussia (D. C.) 100 Fed. 486; Minturn v. Alexandre (D. C.) 5 Fed. 119; Fretz v. Bull, 12 How. 468, 13 L. Ed. 1068. I direct that the decree herein shall contain a sentence that said intervening libelant take nothing.

From consideration of the evidence, the court finds that the Trader was seriously injured by the collision, and that $2,500 is a reasonable estimate of the damages for said injury. The total amount of damages caused by the collision, with interest thereon, computed at the rate of 6 per cent. per annum, from the 1st day of January, 1903, to the 1st day of April, 1904, amounts to the sum of $11,825, and the amount for which the Trader is liable, after deducting $2,500 and interest thereon, amounts to the sum of $3,225, to which will be added one-half of all the taxable costs; and by the decree it will be directed that the owners of the Trader pay into court said amount plus one-half of the taxable costs, out of which will be paid the total amount of the taxable costs, and the residue will be paid to the libelant.