COMPAGNIA MARITIMA LA EM-
PRESA, S.A., Appellant,

v.

Rod PICKARD, Appellee.

No. 19838.

United States Court of Appeals
Fifth Circuit.

July 10, 1963.

---

Cromwell Anderson, Smathers & Thompson, Miami, Fla., for appellant.

George H. Henry, Miami, Fla., for appellee.

Before BROWN, GEWIN and BELL, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal attacks a decree allowing to Libelant Pickard the sum of $20,215.-80 [1] as maritime liens against the M/V EDA, a beautiful vessel at one time the presidential yacht for a one-time president of Venezuela. While this case is *in rem* against the yacht and must be judged on applicable principles of maritime liens, it is but one phase of a many fronted controversy between Pickard and his former associates in what was hoped to be an advantageous purchase of the EDA for an even more advantageous and prompt resale. Like many other such ventures, this one foundered leaving now flotsam and jetsam as the subject of the quarrel.

Mindful that we are to resist the temptation to retry admiralty appeals, Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 1962 AMC 1710, cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276; Myles v. Quinn Menhaden Fisheries Inc., 5 Cir., 1962, 302 F.2d 146, 1962 AMC 1626; Ohio Barge Line, Inc. v. Oil Transport Co., 5 Cir., 1960, 280 F.2d 448, 1961 AMC 375, only a bare bones recital of facts, many of which were stipulated, is required. Pickard, a resident of Florida, heard about the imminent sale of the Yacht EDA being made under the orders of a Venezuelan court. Apparently he thought he could turn the vessel quickly for a nice profit. When he sought financing from a bank in Panama, that bank suggested that one of its clients, Panama Insurance Company (PAINSCO) might be interested (for a slice of the profits of course). It was. With PAINSCO as a sort of guarantor (called an avowal) on the note, the Bank ostensibly loaned Pickard some $370,000. The Yacht was purchased in the name of Pickard. But it is perfectly plain from the nature of the transaction that he was not, nor was he intended to be, the vessel owner. The written agreement with PAINSCO provided that Pickard was to be reimbursed for all of his expenses in care and maintenance and sale of the vessel, and after all expenses incurred by him, bank loans, avowal fees, lending fees, etc. had been repaid, he would receive a 5% commission for any sale.[2]

---

1. The District Court rejected Pickard's claim of a lien for $8,500 for personal services and also disallowed as not qualifying as maritime liens the following:

   | | |
   |---|---|
   | Interest paid on bank loans | $1,875.00 |
   | Telephone & telegraph charges | 403.36 |
   | Clerical and accounting expenses | 1,700.00 |
   | Total (October 1959-March 1961) | $3,978.36 |

2. The agreement expressly recognized that the proceeds were subject to Pickard's first call. Par. 6 provided:

   "6. Pickard agrees that proceeds of the sale of the yacht 'EDA' is to be paid to Painsco, less any outstanding current obligations * * *."
   The capital risk was solely PAINSCO's. See Par. 4 and 8:
   "4. The total purchase price of approximately $351,000 plus all expenses, including interest and premiums on bonds and money borrowed is to be paid by Painsco."
   "8. Pickard is to be reimbursed by Painsco for all expenses relative to the removal, preparation, maintenance and

With further funds advanced to Pickard by PAINSCO, the vessel was manned and outfitted for a voyage to Miami. The quick sale hoped for did not materialize. To put the ship in attractive condition, extensive overhaul was required. With increasing out-of-pocket expenses, interest on the bank loan, and no funds in sight for repayment of principal, PAINSCO became concerned. To regularize PAINSCO's real ownership, Pickard formally conveyed the vessel on October 28, 1959, to McGrath, executive vice president of PAINSCO as the corporation's nominee. As of that time, Pickard had expended $17,446.64 against advances and reimbursements from PAINSCO of $15,000 leaving a balance of approximately $2,000.

The amount allowed by the Court ($20,215.80) represents a major part of the net balance remaining unpaid for expenditures made from that date (October 28, 1959) [3] down to March 10, 1961, at which time the vessel was sold to Greek interests who designated the Claimant corporation as the purchaser.[4] It seems agreed that the sale price of $500,000 was salvage at best since, mixing figuratives a little, this seahorse had long since eaten its head off.

By trying to compress this into a mold which it obviously is not—that is, a relationship in which Pickard is the equivalent of a general agent—the Claimant urges that none of the items in this large bill give rise to a maritime lien.[5]

sale of the yacht upon his presentation of the invoices to Painsco."

3. After crediting $72,656.07 paid to, or received by, Pickard, the balance was as follows:

Balance items paid by Pickard $22,747.66
Due by Pickard 1,446.50

$24,194.16

Deduct: Non-maritime claims (see note 1, supra) 3,978.36

Total decree $20,215.80

4. The stipulation invited by the Court on oral argument reflects what we surmised, that the litigation does not really concern so-called secret liens against property now owned by an innocent third party. In the sale by PAINSCO title was warranted and, supplying the release of libel bond and the defense of the libel, it will bear the consequences of the decree. While this does not alter the necessity that we view this on principles of maritime liens, for us to know the true facts is quite in keeping with the long established admiralty concept of the real party at interest, The SS Denny, D.C.N.J., 1941, 40 F.Supp. 92, 1941 AMC 1835; The Trader, D.C.Wash., 1904, 129 F. 462; The Algic, D.C.Fla., 1936, 13 F. Supp. 834, 1936 AMC 415; The Mandu, D.C.N.Y., 1937, 20 F.Supp. 820, 1937 AMC 1062; which preceded by many years rules such as F.R.Civ.P. 17.

5. To epitomize its theory, Claimant urges this excerpt from The West Irmo, 3 Cir., 1924, 1 F.2d 87, 88, 1924 AMC 1293:
"It is well settled that, in the absence of an express agreement to the contrary,

or facts from which it would be implied, a general agent does not have a maritime lien for advances and disbursements which he makes in behalf of vessels belonging to his principal during his agency. The J. C. Williams (D.C.) 15 Fed. 558; The Raleigh (D.C.) 32 Fed. 633; China Mutual Insurance Co. v. Ward, 59 Fed. 712, 8 C.C.A. 229; The Gyda (D.C.) 235 Fed. 266, 269; The Ascutney (D.C.) 278 Fed. 991; The Centaurus (C.C.A.) 291 Fed. 751. The agent is presumed to rely upon the credit of the owner and not the vessel. This presumption may be rebutted and overcome. The Puritan (D. C.) 258 Fed. 271; The Ascutney (D.C.) 278 Fed. 991, 993. To overcome it, however, the agent must affirmatively prove the existence of an express agreement giving him a lien or such circumstances as justifies the implication of one. The Raleigh, supra; The Puritan, supra; The City of Camden (D.C.) 147 Fed. 847, 849."

Based on the proposition that an owner or part owner cannot have a maritime lien on his own vessel, see Frontera Fruit Co. v. Dowling, 5 Cir., 1937, 91 F.2d 293, 295–296, 1937 AMC 1259; Challenger, Inc. v. Durno, 5 Cir., 1955, 227 F.2d 918, 1956 AMC 111; cf. The F. S. Loop, S.D.Cal., 1945, 63 F.Supp. 105; Garcia & Diaz, Inc. v. Empressa Naviera de Cuba, S.D.N.Y., 1958, 158 F.Supp. 147, 1958 AMC 1441, Claimant makes the further dubious argument that an agent for such part owner could not acquire a lien.

In the face of the trial Judge's findings which are sufficiently watertight to pass the amphibious clearly erroneous test, this attack fails. Many of the things Pickard did may well have resembled those performed by a general agent. But his relationship to PAINSCO and to the Yacht EDA was something quite different. He was to outfit, maintain, repair, refurbish and undertake to sell the vessel so that out of the proceeds, he, and they, would get compensation and profit. Looking ultimately to the proceeds, as the arrangement called for, Pickard necessarily looked also to the ship from whence would come the proceeds.

The thing which characterizes a general agent as known in the maritime fraternity is a mutual interdependence on the financial credit and stability of each of the parties, agent and owner. The arrangement by its very nature contemplates that the agent must do many things in advance of the arrival or after departure of the vessel. Reimbursement of his expenditures and the payment of his fees, whether by commissions on freight or otherwise, is not dependent upon the profitableness of that immediate venture. Here, on the other hand, this was a single-shot affair in which none of the parties dealt on the *credit* of the others. Presumably each took into account the general business integrity and reliability of the other. But beginning with the Bank, followed by PAINSCO, neither depended on Pickard for repayment of the loan. The venture was for the purchase and resale of a specific vessel. All knew that profits, if any, would come solely out of and from the ship herself. Hence PAINSCO in a letter to Pickard was careful to prescribe with great detail how proceeds of any sale were to be distributed. Since it was agreed that Pickard should be reimbursed for his expenses in outfitting and maintaining the vessel, the arrangement contemplated that he, like the Bank and PAINSCO, would in the final analysis look to the ship (see note 2, supra).

Pickard was not called a general agent. He was not a general agent in fact. By the nature of the transaction, his rights are not burdened with any presumption attributed generally to that status that he did not look to the credit of the ship herself. Indeed, the trial Court was fully warranted in concluding that under the facts of this unusual case the Claimant had failed to overcome the presumption which arises from the statutory language that "it shall not be necessary to allege or prove that credit was given to the vessel." 46 U.S.C.A. § 971. Pascagoula Dock Station v. Merchants & Marine Bank, 5 Cir., 1959, 271 F.2d 53, 1959 AMC 2207; The Allen's Cay, 5 Cir., 1960, 277 F.2d 540, 1960 AMC 1598; Roberts v. Echternach, 5 Cir., 1962, 302 F.2d 370, 373; Findley v. Lanasa, 5 Cir., 1960, 276 F.2d 907, 910, 1960 AMC 1444; Barnouw v. SS Ozark, 5 Cir., 1962, 304 F.2d 717, 1962 AMC 1675; Merchants & Marine Bank v. The T. E. Wells, 5 Cir., 1961, 289 F.2d 188, 1961 AMC 1042.

Of course this is far from holding that as to every expenditure the arrangement gave rise to a consensual lien enforceable in admiralty as one *in rem*. The question still remains whether the things done or furnished came within the statute as "repairs, supplies, towage, use of dry dock or marine railway, or other necessaries * * *." 46 U.S.C.A. § 971. As to this phase, we need not examine all of the items nor, as vigorously urged by Claimant, specifically deduct from the final balance those confessedly lacking the character of a maritime lien. Pickard, though not a general agent as such, had an unusual relation to the vessel. He was, first, a person having "authority from the owner to procure repairs, supplies, towage, use of dry dock or * * * other necessaries for the vessel * * *." 46 U.S.C.A. § 972. There is not even a remote suggestion that either Pickard or those furnishing such services on his request either knew "or by exercise of reasonable diligence could have ascertained, that because of * * * any other reason, the person [Pickard] ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor." 46

U.S.C.A. § 973. Second, and here more important, Pickard for his own personal account furnished extensive repairs, services, supplies, etc. to the vessel. To perform them, he used his own employees whose wages, withholding taxes, etc. were paid by him. Thus, Pickard, authorized by the owner to arrange for repairs, employed Pickard, a ship repairman, to make them. As was true of a charterer with a simultaneous dual role of ship repairer in Roberts v. Echternach, 5 Cir., 1962, 302 F.2d 370, Pickard is entitled to a lien for such services coming within the statute when procured and furnished directly by him. The same is true as to those supplied by contractors at his direction and as to which there is no doubt that the circumstances gave rise to a maritime lien enforceable by him, cf. Findley v. Lanasa, 5 Cir., 1960, 276 F.2d 907, 1960 AMC 1444,[6] on equitable principles akin to subrogation on which the nautical Chancellor may properly draw. Cf. Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 699, 1962 AMC 1710; Hadjipateras v. Pacifica S.A., 5 Cir., 1961, 290 F.2d 697, 1961 AMC 1417. Third, Pickard was a creditor of the enterprise. As a creditor—barring fraud of which there is no intimation—as to funds paid to him by the debtor or coming into his hands to defray expenses, he had the right to apply these funds as he saw fit in the absence of direction by the debtor. See 40 Am. Jur., Payment, § 126, p. 801; 24 Fla.Jur., Payment § 21.

By a proper evaluation of each of these three factors, the Court was fully warranted in the implied finding that Pickard having used the funds coming into his hands (see note 3, supra) to discharge nonmaritime liens first, the balance of the account represented services which qualified for maritime liens whether furnished by him direct or under circumstances giving him the standing of a lienor.

Affirmed.

6. A cursory check of the agreed statement of account showed that Pickard advanced for crews wages over $23,000.00 thus sparing the vessel risk of those liens "good to the last plank," see Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp., 5 Cir., 1963, 316 F.2d 163, 173, n. 15. With almost the same rank in the hierarchy of liens were payments for repairs, supplies, fuel, stores, drydocking, berthing, etc. totaling over $28,000.00.