FIRST NATIONAL BANK OF JEFFERSON PARISH, Plaintiff–Appellant, Cross–Appellee,

v.

M/V LIGHTNING POWER, in rem, et al., Defendants,

v.

EAGLE FLEET, INC., Intervenor–Appellee, Cross–Appellant.

No. 87–4329.

United States Court of Appeals, Fifth Circuit.

Aug. 17, 1988.

---

Philip A. Franco, Adams & Reese, New Orleans, La., for plaintiff-appellant, cross-appellee.

Joseph P. Tynan, New Orleans, La., for intervenor-appellee, cross-appellant.

Before CLARK, Chief Judge, GOLDBERG and GARWOOD, Circuit Judges.

CLARK, Chief Judge:

This is an appeal from a judgment granting Eagle Fleet, Inc. (Eagle Fleet) a 46 U.S.C.App. § 971 lien on the M/V LIGHTNING POWER for seaman's wages.[1] The basis of this judgment was the district court's fact determination that Eagle Fleet was a special rather than a general agent of the vessel's owner. We affirm the district court.

### I.

This case has been before this court on a prior occasion. *First Nat'l Bank v. M/V LIGHTNING POWER*, 776 F.2d 1258 (5th Cir.1985). In that opinion we vacated a judgment confirming a court-ordered sale of the *M/V LIGHTNING POWER*. First National Bank of Jefferson Parish (FNB)

---

1. Section 971 provides:

Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

46 U.S.C.App. § 971; *see also id.* § 974 ("Nothing in this chapter shall be construed to prevent the furnisher ... from waiving his right to a lien....").

held a $900,000 mortgage on the *M/V LIGHTNING POWER*, a vessel then worth more than $500,000. During the course of the foreclosure proceedings, FNB successfully bid $5,000 at an interlocutory sale. The district court confirmed the sale over the objection of Eagle Fleet who argued that it had a lien on the vessel for seamen's wages. We set aside confirmation of the sale and remanded for further proceedings on the grounds that, given the gross disparity between the price bid and the value of the vessel, the district court should not have confirmed the sale without determining whether the rights of third persons such as Eagle Fleet would be affected.

On remand, Eagle Fleet argued that it had a section 971 lien for seaman's wages. The parties stipulated that the only issue to be tried was whether Eagle Fleet was a general or a special agent of James T. Strader, the vessel's owner.[2] The uncontroverted facts established that Eagle Fleet, as operator of the vessel, paid seamen's wages. The district court held that Eagle Fleet was a special agent and entitled to a $59,930 lien for wages paid from December 1983 through August 1984. FNB appeals the finding on agency while Eagle Fleet appeals the district court's refusal to increase the lien by the amount of wages allegedly paid for October and November 1983.

## II.

While the district court's sale order was on appeal, the *M/V LIGHTNING POWER* was released to FNB and sold to a third party. FNB attributes this to Eagle Fleet's failure to post a *supersedeas* bond and to secure a stay. FNB asserts that the district court's jurisdiction to render a judgment enforcing Eagle Fleet's lien was limited to the *res*, the $5,000 in proceeds from the judicial sale of the vessel deposited in the registry of the court. Eagle Fleet counters that FNB agreed at a January 3, 1986 pretrial conference to be personally liable for any indebtedness adjudged against the vessel if Eagle Fleet would refrain from executing a warrant to bring the vessel within the jurisdiction of the court. No such agreement appeared in the record on appeal. We remanded to the district court to have the record conformed to reflect the truth of the matter. *See* Fed.R.App.P. 10(e).

■ After conducting a hearing, the district court found that FNB agreed at the pretrial conference to pay any judgment which might be awarded Eagle Fleet. FNB contends that this finding is clearly erroneous. We disagree. Several witnesses were called because the district judge had no personal recollection of the agreement. Lawrence Krim, the President of Eagle Fleet, and Joe Tynan, Eagle Fleet's attorney, both testified at the hearing that the agreement was made in the presence of the court at the pretrial conference. FNB's attorney, Nel Vezina, testified that he had insisted on Krim leaving the pretrial conference before it began. The district court noted, however, that it had no policy prohibiting clients from attending pretrial conferences and that Krim and Tynan had testified that Krim did not leave the conference until a few minutes before it ended. Vezina also testified that when Tynan mentioned reseizing the vessel, Vezina said that it had already been sold and that seizure could subject Eagle Fleet to substantial liability. Tynan testified that Krim abandoned plans to seize the vessel in reliance on FNB's commitment to pay any judgment rendered in favor of Eagle Fleet, not out of fear that liability might accompany seizure. The district court credited Krim

---

**2.** At the outset of the trial, FNB's attorney said: "It's my understanding, Your Honor, that the issue we're going to try today is one dealing with the facts surrounding and the ultimate issue of law on whether or not Eagle Fleet is a general or a special agent." Eagle Fleet's attorney had the same understanding: "And, as I understand it, we have narrowed the issues down to the issue of general agency versus special agency of Eagle Fleet." The district court's opinion accepted this framing of the case:

The parties have agreed that the only issue before the court is whether Eagle Fleet was a general or a special agent of [Strader]. It is only if Eagle Fleet was a special agent, rather than a general agent, that Eagle Fleet may recover the amount of money it paid in seamen's wages.

and Tynan's testimony rather than Vezina's.

The district court also reasoned that since the parties had reduced the trial to a single issue, entitlement to a maritime lien, the equally vital issue of who would pay the judgment must have been resolved prior to trial. According to FNB, Eagle Fleet could just as well have been unaware that any recovery would be limited to $5,000. FNB also argues that Eagle Fleet's failure to make the agreement a matter of record undercuts the likelihood that such an agreement was made. Tynan testified that he did not request the agreement to be noted on the minute entry because it had been made in the *judge's presence*. While this explanation may reflect on Tynan's courtroom procedures, it does not necessarily impugn his credibility.

Finally, FNB contends that if an agreement existed, Eagle Fleet had no reason to contest FNB's Preferred Ship Mortgage. That FNB may construct a version of the evidence to support a finding other than that reached by the district court does not render the court's finding clearly erroneous. The district court considered the credibility of testimony that went directly to the point at issue. The inferences to be drawn from the actions of the parties cannot be separated from the testimony and credibility of these witnesses. Our review of the record does not leave us "with a definite and firm conviction that a mistake has been made." *Elevating Boats, Inc. v. Gulf Coast Marine, Inc.*, 766 F.2d 195, 199 (5th Cir.1985).

## III.

■■■ A person who furnishes repairs, supplies or other necessaries to a vessel at the behest of the owner or his agent is entitled to a section 971 lien upon the vessel provided he did not look solely to the credit of the owner or the charterer. Seamen may be entitled to such a lien for wages owed and those subrogated to seamen's claims take equivalent status. *Bank of New Orleans & Trust Co. v. Oil Screw*

*Tracy Marie*, 455 F.Supp. 78, 80 (W.D.La. 1978), *aff'd*, 580 F.2d 808 (5th Cir.1978).

> [U]nder section 971, a presumption arises that one furnishing supplies [or other qualifying items or services] to a vessel acquires a maritime lien, and the party attacking this presumption has the burden of establishing that the personal credit of the owner or charterer was solely relied upon. To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien. Because of the strong presumption in favor of a maritime lien, it is necessary that a party opposing the lien prove that the creditor ... deliberately intended to look solely to the owner's personal credit and to forego the valuable privilege afforded it by law.

*Equilease Corp. v. M/V SAMPSON*, 793 F.2d 598, 605–06 (5th Cir.) (en banc) (citations omitted; footnote omitted), *cert. denied*, 479 U.S. 984, 107 S.Ct. 570, 93 L.Ed. 2d 575 (1986).

■■■ If the party contesting the maritime lien presumption establishes that the creditor was a general agent, a presumption arises that the creditor looked solely to the credit of the owner. *Compagnia Maritima La Empresa, S.A. v. Pickard*, 320 F.2d 829, 832 (5th Cir.1963). The theory is that a general agent "acts not as a stranger relying on the security of the vessel but as an agent of the owner to whom he looks for payment." *Savas v. Maria Trading Corp.*, 285 F.2d 336, 339 (4th Cir.1960). A creditor may contest the basic facts giving rise to the general agency presumption or rebut the presumed fact by establishing that he nonetheless relied upon the security of the vessel. Continuity of service and scope of authority are particularly relevant to classifying maritime agencies—scope of authority being the more important factor. *Ameejee Valleejee & Sons v. M/V VICTORIA U.*, 661 F.2d 310, 313 (4th Cir.1981). The broader the delegated authority the more likely the agent is a general agent. *Id.*[3]

---

**3.** The legal distinction between general and special maritime agents is not altogether clear. *See*

G. Gilmore & C. Black, The Law of Admiralty 626 (2d ed. 1975) (characterizing as "mysterious

*Pickard* concerned a venture involving the purchase and resale of a specific vessel. The owner's agent was to refurbish and sell the vessel so that out of the proceeds he and the owners might be compensated. In that case, the court stated:

> The thing which characterizes a general agent as known in the maritime fraternity is a mutual interdependence on the financial credit and stability of each of the parties, agent and owner. The arrangement by its very nature contemplates that the agent must do many things in advance of the arrival or after the departure of the vessel. Reimbursement of his expenditures and the payment of his fees, whether by commissions on freight or otherwise, is not dependent on the profitableness of that immediate venture.

*Pickard,* 320 F.2d at 832. The agency in *Pickard* could not be characterized as the type of general agency in which the agent relied solely on the credit of the owner because of the nature of the transaction: "[T]his was a single-shot affair in which none of the parties dealt on the *credit* of the others." *Id.* (emphasis in original). Instead, "[a]ll knew that profits, if any, would come solely out of and from the ship herself." *Id.*

■ In the case at bar, the district court held that Eagle Fleet was a special agent, not a general agent. The district court found that Eagle Fleet neither undertook a job for the boat without the owner's express approval, nor made repairs for the boat without first consulting Strader. The district court also found that Eagle Fleet hired crews and determined salaries only with the owner's express approval. The district court's factual findings were not clearly erroneous. Given these facts, the district court properly inferred that Eagle Fleet, regardless of its length of service, did not possess the requisite scope of authority to be a general agent.

[the] sort of agent who qualifies as a 'general agent'"). In light of the federal lien statute and the strong presumption that operates in favor of

IV.

The district court's opinion states that "Eagle Fleet depended solely upon the earnings of the vessel to fund the advances which Eagle Fleet made for routine maintenance, repairs authorized by Strader, groceries and wages for the crew, fuel, and other necessaries." In its conclusions of law, the district court reiterates that "Eagle Fleet did not rely upon the credit of Strader at any time; rather, Eagle Fleet relied upon the earnings of the vessel to recompense it for those sums it had paid for the repairs, supplies, and necessaries for the vessel." FNB argues that the earnings of a vessel differ from the credit of a vessel and that a creditor who looks solely to the former may not obtain a section 971 lien. To support its contention, FNB would have us follow *Barnes v. THE "KONGO,"* 174 F.2d 67, 68 (6th Cir.1949). There the sixth circuit held without explanation that persons loaning money to the owner of a vessel to be repaid by specific assignments of freight charges from designated shippers had relied "solely on [the vessel's] earnings" and that such reliance waived any lien on the vessel itself. In *Fielder v. Bay Construction Co.,* 5 F.2d 227 (5th Cir.1925), however, this circuit recognized that a libelant who had advanced funds to pay the wages of the crew and was to be repaid out of the dredge's future earnings did not forfeit his right to a lien on the dredge. Judge Bryan speaking for the court said:

> One who has a lien recognized in admiralty waives it by accepting the credit of the owner. But reliance upon the earnings of a vessel shows conclusively that the lien is not waived, and that the creditor is unwilling to accept the liability of its owner.

*Id.* at 228.

We decline FNB's invitation to depart from the latter rule not only because we are bound by the prior decision of this circuit, but also because we think it to be the sounder rule. The parties stipulated to

maritime liens, it is not wholly clear to us why the general agency presumption continues to survive.

the fact that Eagle Fleet had paid seamen's wages, a basic fact that gives rise to a "strong presumption" that Eagle Fleet acquired a maritime lien. This presumption casts on FNB the burden of proving that Eagle Fleet either relied solely on the credit of the owner or otherwise "purposefully intended to forego the lien." In light of *Fielder*, the district court's statement that Eagle Fleet looked solely to the earnings of the vessel simply emphasizes its finding that Eagle Fleet did not look to the credit of the owner. The earnings of a vessel are directly related to the vessel itself. Unless the evidence establishes an intent to detach its earnings from the credit of the vessel, a creditor does not forego his right to a lien by looking to the earnings of the vessel. The district court made no finding and no evidence appears in the record indicating that by looking to the earnings of the vessel Eagle Fleet intended to forego its right to a maritime lien.

Furthermore, FNB waived this issue by not presenting it to the district court. This issue does not involve a pure question of law, nor will our failure to consider it result in a miscarriage of justice. *United States v. Community Science Technology, Inc.*, 574 F.2d 1292, 1296 (5th Cir.1978). FNB joined Eagle Fleet in representing to the district court that the only issue to be tried was whether Eagle Fleet was a general agent. *See supra* note 2. The court certainly understood this to be the critical issue. *Id.* FNB, having failed to prevail on its theory of the case, would now have us reverse the district court because of its characterization of a single fact not immediately related to the general/special agent question. Indeed, the record contained facts that would have supported a finding that Eagle Fleet relied on the earnings of the vessel *and* the credit of the vessel. Had FNB argued to the district court that Eagle Fleet waived its right to a lien by looking solely to the earnings of the vessel, we do not doubt that the judge would have characterized its findings to reflect Eagle Fleet's reliance on both the earnings and the credit of the vessel.

## V.

The district court fixed the lien in accord with the stipulated amount Eagle Fleet had paid in seamen's wages from December 1983 through August 1984. The district court did not err by declining to award Eagle Fleet amounts allegedly paid for October and November 1983 wages. The only evidence offered to support wage payments for these two months were a computer printout and the testimony of Krim. Figures appeared below each of the eight columns on the printout which included a column for month, wages and taxes. Although the figures corresponding to December 1983 through August 1984 equaled the stipulated sum, the printout was neither self-authenticating nor authenticated by the testimony of Krim. *See* Fed.R.Evid. 901–902. Krim testified to the amount of October and November wages from this printout, not to the origin of the printout. Eagle Fleet, apparently assuming that the stipulation would cover its entire claim for wages, failed at trial to prove payment of October and November wages.

## VI.

The judgment appealed from is AFFIRMED.