UNITED STATES of America,
Plaintiff-Appellee,

v.

Cesar Alfredo TAMAYO, Defendant-
Appellant.

No. 23994.

United States Court of Appeals,
Ninth Circuit.

June 3, 1970.

Louis V. Vasquez (argued), San
Francisco, Cal., Cesar Alfredo Tamayo,
for defendant-appellant.

Richard W. Nichols (argued) Asst. U.S. Atty., John P. Hyland, U.S. Atty., James J. Simonelli, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before MERRILL and DUNIWAY, Circuit Judges, and BYRNE, District Judge.*

DUNIWAY, Circuit Judge.

Tamayo appeals from the judgment of conviction under both counts of an indictment. Count I charges that he had "in his possession approximately 118 Immigration Forms I–186, Nonresident Alien Mexican Border Crossing Cards * * * well knowing them to have been procured by fraud and unlawfully obtained." This count is based on 18 U.S.C. § 1546.[1] Count II charges that he transported from San Ysidro, California to Gridley, California one Camargo-Gonzalez, "an alien not lawfully entitled to enter the United States for the purpose of employment, knowing that * * * Camargo-Gonzalez was in the United States in violation of law and that his last entry * * * occurred on June 2, 1968, * * * in order to further * * * Camargo-Gonzalez' being in the United States for the purpose of illegal employment." This count is based on 8 U.S.C. § 1324(a) (2).[2]

Sentences were five years on each count, concurrent.

Tamayo argues that his conduct did not violate 18 U.S.C. § 1546. There was no proof that any of the cards were originally obtained by the aliens to whom they were issued by false claim or statement or fraud or unlawfully from anyone. Tamayo obtained possession of the cards in the course of his business of transporting nonresident Mexican aliens to places where they could find work. He charged each of them $80.00 for this service and kept their Border Crossing Cards as security until he was paid. He claims that section 1546 does not cover what he did, that it is aimed at obtaining the card from the government. The section is certainly not a model of good draftsmanship; a better description would be that it is a masterpiece of obfuscation, a not uncommon fault of federal statutes. We need not, however, pursue the question, because the sentences are concurrent, and Tamayo's conviction under 8 U.S.C. § 1324(a) (2) is valid, Hirabayashi v. United States, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774; Pasterchik v. United States, 9 Cir., 1968, 400 F.2d 696. Although there is no jurisdictional bar to consideration here of the conviction under § 1546,

---

* Honorable William M. Byrne, United States District Judge, Central District of California, sitting by designation.

1. The first and last paragraphs of 18 U.S.C. § 1546, which is a long section dealing primarily with forging or counterfeiting immigration papers, read: "Whoever, knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, or other document required for entry into the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, or document, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained; * * *

Shall be fined not more than $2,000 or imprisoned for not more than five years, or both."

2. 8 U.S.C. § 1324(a) (2) reads: "Any person, including the owner, operator,

pilot, master, commanding officer, agent, or consignee of any means of transportation who— * * *

(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law; * * * any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both * * *."

Benton v. Maryland, 1969, 395 U.S. 784, 791, 89 S.Ct. 2056, 23 L.Ed.2d 707, we decline in the exercise of our discretion to examine it on the merits. Benton v. Maryland, *supra; see* United States v. Felix, 9 Cir., 425 F.2d 240, (April 24, 1970); Jordan v. United States, 9 Cir., 1969, 416 F.2d 338, 346.

The pertinent facts are these: In Mexico, Tamayo agreed with Camargo-Gonzalez that he would transport the latter, for a consideration, to a place in California where he could obtain work. Camargo crossed the border, using his nonresident alien border crossing card, Form I–186. This was issued under 8 C.F.R. § 212.6(b). As provided in § 212.6(a), it authorized an entry for not more than 72 hours, to visit in the immediate border area, then defined as within a distance of 150 miles from the border. It did not authorize him to seek work; he was not eligible to enter for that purpose. See 8 U.S.C. §§ 1101(a) (27) (C), 1182(a) (14). Tamayo then transported Camargo to Gridley, California, about 600 miles from the border, where he found work. As security for the promised consideration, Camargo delivered his I–186 card to Tamayo.

█ Counsel does not claim that this evidence is insufficient, nor could he successfully do so. He does claim that the government obtained the evidence in violation of his rights under the search and seizure provisions of the Fourth Amendment. This claim is based upon the manner in which the government learned that Camargo was involved. For the purpose of this discussion, we assume that it was Camargo's Form I–186 card, which was obtained in the manner described below, that led government investigators to Camargo, and enabled the government to build its case under Count II.

On July 24, 1968, Tamayo and his wife ate in a restaurant in Chico, California. After they left the restaurant, employees discovered a plain brown paper bag. The bag contained 118 Form I–186 cards.

The employees called the Chico Sheriff's office and a Sergeant Baxter of that office came to the restaurant and picked up the bag and cards. After looking at the cards, Sergeant Baxter telephoned the Border Patrol in Sacramento. The Patrol said they would send personnel to Chico the following morning to look at the cards.

That same afternoon Tamayo returned to the restaurant and asked if a bag had been found. The restaurant manager phoned Sergeant Baxter and told Tamayo that the bag had been turned over to the sheriff's office. Tamayo and Baxter met outside the restaurant and Tamayo, at Baxter's request, followed him back to the sheriff's office. When Tamayo attempted to claim the bag, he was told that the Border Patrol was coming the next morning to look at the bag's contents, and was asked if he would come back the next day. He agreed.

The next morning the Border Patrol officers Schnase and Goede arrived at the sheriff's office. The officers examined the cards and told Sergeant Baxter that he could give the bag and its contents to Tamayo. The Border Patrol officers then left the sheriff's office and stationed themselves nearby. Later, Tamayo drove up, entered the office, received the bag, and departed. The Border Patrol officers stopped Tamayo's car and after Officer Schnase identified himself and examined Tamayo's papers, which showed that Tamayo was a resident alien, he asked Tamayo what was in the bag which was visible on the front seat. Tamayo said he had picked the bag up at the sheriff's office. Schnase asked to see it, and Tamayo handed the bag to Officer Schnase through the side window of his car. The bag contained the Form I–186 cards. Schnase requested Tamayo to follow him to Sacramento to talk with Immigration officers. Tamayo agreed and followed the officers to Sacramento in his own car.

In Sacramento, Tamayo, after being fully warned, explained that he had lunched in Chico with a friend the previous day and then had driven the

friend to the bus depot. At the depot the friend told Tamayo that he had left a bag at the restaurant and asked Tamayo to retrieve it and return it to him in Los Angeles. After hearing this story, the Immigration officers placed Tamayo under arrest. One of the cards in the bag had been issued to Camargo.

 We take judicial notice that Chico is in the heart of the great agricultural area in the Sacramento Valley, and that the area is one to which many Mexican aliens having Camargo's status are often brought to the fields to work. The Form I–186 is a personal document of the alien.[3] Finding so many of these cards in one paper sack certainly gave the officers reasonable and probable cause to believe that whoever had had possession of them was involved in violating § 1324(a) (2), as well as § 1546. When Tamayo showed up and claimed them, they then had probable cause to arrest him. Up to that time there had been no unconstitutional search. The cards were found and turned over to the officers by private citizens doing just what good citizens should do when they find something that leads them to believe that some hanky panky may be going on in violation of the laws of the United States. Tamayo could have been validly arrested when he returned to the sheriff's office to claim the cards, and the cards could then have been held as material evidence. We need not decide whether they were "contraband," as the government claims.

The subsequent charade in which Tamayo was allowed to take the cards, followed by the stopping, Tamayo's handing the cards to the officers, the trip to Sacramento, the interview, and the formal arrest, added nothing of substance to the government's case. At the most it was a further manifestation of that which Tamayo had already made clear—that the bag and its contents had

been in his possession and that he wanted to get them back. During all of that time, the officers had the same probable cause for an arrest that they had before the charade began. Having probable cause to arrest, they also had cause to seize the evidence that they knew Tamayo had.

Affirmed.

---

3. 8 C.F.R. § 212.6(a) is liberally sprinkled with references to the "rightful holder" of a Form I–186, which obviously refers to the alien to whom it is issued. These documents are not commercial paper and there is no reason for them to be out of the possession of the person to whom they were issued.