FIRST NATIONAL BANK OF JEFFERSON PARISH, Plaintiff-Appellee,

v.

M/V LIGHTNING POWER, et al., Defendants,

Eagle Fleet, Inc., Intervenor-Appellant.

No. 85–4233
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Nov. 19, 1985.

Joseph P. Tynan, New Orleans, La., for intervenor-appellant.

Jessie N. Gros, III, Nel F. Vezina, Gretna, La., for plaintiff-appellee.

Before RUBIN, JOHNSON, and JONES, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A mortgagee holding a $900,000 mortgage on a vessel, which had a current market value in excess of $500,000, bid $5,000 for the vessel at an interlocutory sale in the foreclosure proceeding without obtaining court authority to bid up to the amount of its mortgage. The sale was confirmed by the district court over the objection of a third party who contended that it held a lien on the vessel for seaman's wages that would have primed the mortgage, that the sale price was grossly inadequate, and that it would have bid $150,000 for the vessel. Because the price is patently and grossly out of all proportion to the value of the vessel, we hold that the district court should not have confirmed the sale without at least determining whether the rights of third persons, such as the asserted lien-holder, would be affect-

ed. We, therefore, reverse the judgment confirming the sale and remand for further proceedings consistent with this opinion.

### I.

First National Bank of Jefferson Parish had a First Preferred Ship Mortgage on the M/V LIGHTNING POWER on which $900,000 was due. It filed a foreclosure complaint and obtained an order from the district court to sell the vessel at public auction. The public notice of sale stated: "The successful bidder will be required to deposit twenty-five (25%) per cent of the bid in cash or certified cashier's check. The payment of the balance of the purchase price shall be made in a similar manner within forty-eight (48) hours."

On the day of the auction, at a time variously described by the parties as a few minutes, five minutes, or a half hour before bidding began, the marshal advised prospective bidders that no one would be permitted to bid unless he delivered to the marshal a letter of credit on a local bank or a certified check showing his ability to pay the bid price if successful.

Eagle Fleet, Inc. asserts that it has been subrogated to claims for seamen's wages amounting to $110,000 that would be entitled to a lien on the vessel ranking the First Preferred Ship Mortgage. It had not intervened in the foreclosure proceeding although apparently its claim had been registered with the Coast Guard for a claim by Eagle Fleet is noted on the Coast Guard certificate attached to the complaint. The president of Eagle Fleet, Laurence M. Krim, appeared at the sale, prepared, he alleges, to bid up to $150,000. He had neither cash, letter of credit, nor similar document, but states that he had arranged with the company's Texas bank to transfer sufficient funds by telegraph to a bank in Lafayette, Louisiana, where the auction was held, to buy the vessel if his bid was successful. There is some support for his

testimony in a later telegram from the Texas bank. As a result of the marshal's last minute instructions, however, he was unable to bid.

The only bidder was the mortgagee bank, which bid $5,000. Within six days after the auction, and before the sale was confirmed, Eagle Fleet intervened, asserting a maritime lien for the crew's wages in the amount of $110,000, and also filed a motion to "rescind the sale," although the court had not yet confirmed the bid and title had not yet been transferred. Thereafter, the bank sought an order confirming the sale and cancelling all liens on the vessel.

The district court held that, although the advertisement did not expressly state that proof of financial ability would be a precondition to bidding, the statement that a deposit of twenty-five percent would be required sufficiently informed potential bidders that they had to appear with funds sufficient to pay the deposit. The bank did not controvert Eagle Fleet's estimate that the vessel was worth $500,000, but the court confirmed a sale for $5,000, reasoning that Eagle Fleet might have bid any amount up to the balance due on the mortgage without doing any more than crediting the note, and that a second sale would not benefit other creditors any more than the first sale.

### II.

The proceeding for conducting sales of vessels is not fixed by statute. In at least some districts, it is the practice for a mortgagee who wishes to bid on property to obtain a court order permitting it to bid up to the amount due it without payment of cash, although a bond or cash deposit may be required.[1] The record contains no evidence of the practice in the Western District of Louisiana and the notice contains no qualification of the announcement that the sale will be "for cash, to the highest bidder." Moreover, it is doubtful that, if

---

1. *See, e.g., Jefferson Bank & Trust Co. v. Van Niman,* 722 F.2d 251 (5th Cir.1984); *International al Paint Company, Inc. v. M/V Mission Viking,* 462 F.Supp. 899 (S.D.Ala.1978), rev'd in part on other grounds, 637 F.2d 383 (5th Cir.1981), judgment clarified, 642 F.2d 160 (5th Cir.1981); 7 M.B. Crutcher, West's Federal Forms § 11943 (3d ed.1977 & Supp.1985).

liens that primed the First Preferred Ship Mortgage had been filed, the court would or could authorize a mortgage holder, in effect, to prime the liens by merely crediting the amount of its bid on the mortgage and paying only the costs in cash.

Absent fraud or collusion, a bid at a judicial sale should not ordinarily be rejected, we have repeatedly held, but "the court has power to do so if the price is so grossly inadequate as to shock the conscience."[2] The bid at the marshal's auction does not consummate a sale. It is the equivalent of an offer to the court, not accepted until judicially confirmed.[3] Until confirmation, the auction bid may be rejected.[4] Upon being petitioned to confirm the sale, the district court has discretion to decide whether or not the bid was egregiously inadequate and, in so doing, should consider whether the rights of third persons would be adversely affected by confirmation.

Auctions should not be empty exercises. The public policy of inspiring confidence in court-ordered sales favors confirmation of the sale to the highest bidder at the auction if it is fairly conducted.[5] The court must also consider, however, the purpose of the judicial sale, which is to benefit both creditors and debtors.

Judicial sales made under the Bankruptcy Act of 1898 provide an appropriate analogy. Although the Bankruptcy Code of 1978 has changed the earlier procedure for the sale of a debtor's assets, admiralty foreclosure sales adhere to a procedure similar to the one followed under the Bankruptcy Act. As Collier on Bankruptcy notes, with prolific case citation, since a sale of assets subject to bankruptcy proceedings is a judicial sale, the seller is the court itself.[6] The highest bidder has simply made an offer, which does not become a contract until it is accepted by the court. "[I]t cannot object to the denial of confirmation if the court finds that the price is unfair...."[7] "Thus, the highest bidder has not been favored where, for example, there was no appraisal, and reliable offers of a higher price made during confirmation proceedings indicated that the highest bid was grossly inadequate."[8]

As the First Circuit has noted, "in the not grossly dissimilar context of bankruptcy sales, gross inadequacy is said to exist when—apart from situations involving fraud or unfairness ...—there is a substantial disparity between the highest bid and the appraisal or fair market value, and 'there is a reasonable degree of probability that a substantially better price will be obtained by a resale.'"[9] The fact that a party opposing confirmation did not bid at the sale is to be considered but it is not per se decisive,[10] particularly when, as here, that party appeared at the sale and has offered evidence of its intention and ability to bid a sum more than twenty times greater than the amount actually bid.

**2.** *Jefferson Bank & Trust Co.*, 722 F.2d at 252; *Ballentyne v. Smith*, 205 U.S. 285, 289, 27 S.Ct. 527, 528, 51 L.Ed. 803 (1907); *Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1188–89 (5th Cir.1977); *Foote v. Kansas City Life Insurance Co.*, 92 F.2d 744, 746 (5th Cir.1937).

**3.** *Munro Drydock, Inc. v. M/V Heron*, 585 F.2d 13 (1st Cir.1978); *In re Gil-Bern Industries, Inc.*, 526 F.2d 627, 628 (1st Cir.1975); *Ridings v. Motor Vessel "Effort,"* 387 F.2d 888, 892 (2d Cir.1968). *See also Camden v. Mayhew*, 129 U.S. 73, 82, 9 S.Ct. 246, 248, 32 L.Ed. 608 (1889).

**4.** *Ghezzi v. Foss Launch & Tug Co.*, 321 F.2d 421, 425 (9th Cir.1963).

**5.** *Munro Drydock, Inc. v. M/V Heron*, 585 F.2d 13, 14 (1st Cir.1978).

**6.** 4B J. Moore & L. King, Collier on Bankruptcy ¶ 70.98 at 1173 (14th ed.1978).

**7.** *Id.* at p. 1178.

**8.** *Id.* at p. 1179.

**9.** *Munro Drydock, Inc. v. M/V Heron*, 585 F.2d 13, 15 (1st Cir.1978) (citing 4B J. Moore & L. King, Collier On Bankruptcy ¶ 70.–98[17] at 1192 (14th ed.1978); *Reid v. King*, 157 F.2d 868, 870–71 (4th Cir.1946)).

**10.** *Munro Drydock, Inc. v. M/V Heron*, 585 F.2d 13, 16 (1st Cir.1978). *See also, American Transp. Shipping & Development Corp. v. Coal Export Corp.*, 276 F.2d 570 (4th Cir.1960).

The district court relied upon the Fourth Circuit decision in *C.I.T. Corporation v. Oil Screw Frank T. Shearman*,[11] but in that case the objection to confirmation of the sale was held ineffective because a local rule provided that, if no exceptions to the marshal's report were filed within two days after the report was submitted the sale "shall stand confirmed as of course." The district court in that case, moreover, failed to note the apparent inconsistency between its comment that the mortgage holder might bid anything up to the amount of its mortgage by simply crediting its note and its later observation that, if the wage claims were bona fide, they would have been entitled to priority, and, if the wage claimants had bid the amount of their claims, the mortgagee would have "had to offer a higher figure," and "a fund for the payment of the wage claims would then have been available."[12]

■ Wages due seamen are given utmost protection by admiralty courts. They are entitled to a preferred maritime lien of the highest rank.[13] "Seamen's wages," as we said in *Brandon v. S.S. Denton*, " 'according to the favorite saying of Lord Stowell and of Mr. Justice Story, are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages.' "[14] Those who are subrogated to the seamen's claims take equivalent status.[15]

■ If, indeed, Eagle Fleet was entitled to the seamen's lien for wages in the amount of $110,000 or some other substantial amount, a matter that the district court has not decided and about which we express no opinion, the court should not have confirmed the sale. If, on the other hand, there was no such lien and no third party is injured as a result of the inadequacy of the price, the court may decide to confirm the sale because, however low the price, no injury has resulted.

■ The district court concluded that confirmation should not be denied on the ground that the marshal required proof of ability to pay the full price of a bid even though the public notice did not warn of this. When such proof is to be required, the public should be notified in the advertisement. But the notice did warn that the sale would be for cash, twenty-five percent payable immediately, and the balance to be paid within forty-eight hours. We find, therefore, no error in the district court's contention that potential bidders were not improperly denied an opportunity to bid.

On appeal, Eagle Fleet raises for the first time a charge that, by agreeing to sell the vessel in advance of sale to another potential bidder and urging that ultimate purchaser not to bid against it, the bank was guilty of collusion and the sale to the bank should therefore be "rescinded," or, at least, not confirmed. Because the issue was not raised in the district court, we express no opinion on it. It is also intimated, although the record does not establish, that the vessel may have been resold. If that has happened, the case may have become moot, or some other remedy may be appropriate. Finally, we note that it is possible that Eagle Fleet received actual notice of the proposed sale and this may affect its rights. Again we reserve judgment on these intriguing but virgin questions, and we do not pretermit inquiry into any of them on remand.

The judgment confirming the sale is set aside and the case is REMANDED for fur-

---

11. 343 F.Supp. 1283 (E.D.Va.1971), *aff'd sub nom., Golden v. Oil Screw Frank T. Shearman*, 455 F.2d 133 (4th Cir.1972).

12. *Id.* 343 F.Supp. at 1284.

13. G. Gilmore & C. Black, Jr., The Law of Admiralty 738 (2d ed.1975); *Fredelos v. Merritt-Chapman & Scott Corp.*, 447 F.2d 435 (on petition for rehearing) (5th Cir.1971). *See also* A. Sann, S.

Bellman, B. Chase, M. Chynsky, Benedict on Admiralty, § 51 at 4–1 n. 2 (6th ed. 1984).

14. 302 F.2d 404, 416 (5th Cir.1962) (quoting The John G. Stevens, 170 U.S. 113, 119, 18 S.Ct. 544, 546, 42 L.Ed. 969 (1898)).

15. *See Bank of New Orleans & Trust Co. v. Oil Screw Tracy Marie*, 455 F.Supp. 78, 80 (W.D.La. 1978), *aff'd*, 580 F.2d 808 (5th Cir.1978).