**John D. BAILEY, et al.**

v.

**METRO FEDERAL SAVINGS AND LOAN ASSOCIATION OF LAKE CHARLES, et al.**

**Civ. A. No. 84–0905.**

United States District Court, W.D. Louisiana, Lake Charles Division.

July 28, 1986.

H. Lee Leonard, Voorhies & Labbe, Lafayette, La., for plaintiff.

Jeff E. Townsend, Jr., Lake Charles, La., for Metro Federal Sav. & Loan.

James C. Gulotta, Jr., Charles Stern, Stone, Pigman, Walther, Whittmann & Hutchinson, New Orleans, La., William K. Black, David A. Felt, Federal Home Loan

Bank Bd., Washington, D.C., for FSLIC as receiver for Metro.

Edward B. Dubuisson, Dubuisson & Dubuisson, Opelousas, La., for Nat'l Union Fire Ins.

Ben W. Lightfoot, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for North River Ins. Co.

## RULING

VERON, District Judge.

This matter is before the Court upon the motion of plaintiffs, John D. Bailey, Robert L. Abshire, and Scott J. Pias, for summary judgment upon the counterclaims of the Metro Federal Savings and Loan Association of Lake Charles, through its receiver, the Federal Savings & Loan Insurance Corporation [FSLIC]. Also before the Court is the FSLIC's motion for summary judgment on its counterclaims against John D. Bailey, Robert L. Abshire, Scott J. Pias, and Kathleen Clower Pias. Before addressing the relative merits of the motions under consideration, it is necessary to set forth the travel of the case to date and also to set forth those factual issues which are not in dispute.

## I. FINDINGS OF FACT AND TRAVEL OF CASE

The plaintiffs, John D. Bailey, Robert L. Abshire, and Scott J. Pias commenced this action by filing a petition in the Fourteenth Judicial District Court for the Parish of Calcasieu, State of Louisiana, naming Metro Federal Savings and Loan Association of Lake Charles, the FSLIC, and David L. Levingston as defendants. In that petition and by subsequent amended complaints, plaintiffs have asserted and it is undisputed that Bailey executed a promissory note on December 17, 1980 in the principal amount of $798,044, secured by a mortgage

granted to Metro Federal affecting a parcel of real property situated in Sulphur, Louisiana; that Abshire similarly executed a promissory note in the amount of $684,596 on December 17, 1980 secured by a mortgage granted to Metro Federal on a parcel of real property adjacent to that property mortgaged by Bailey; and that Scott J. Pias and Kathleen Clower Pias executed a promissory note in the amount of $617,360 secured by a mortgage granted to Metro Federal, secured by a mortgage on a parcel of real property adjacent to that property mortgaged by Bailey and Abshire.

A point of contention between the parties, however, arises as to plaintiffs' further allegation that prior to the closing of these loan transactions, defendant Levingston, acting for Metro Federal, orally agreed to give plaintiffs[1] a counterletter which would state, contrary to the particular loan documents, that Pias and Abshire were only nominal parties and that Bailey was to be the sole obligor on all three loans, and furthermore that all three loans were assumable. Nonetheless, it is undisputed that no such counter-letter was ever issued. In their complaint, the three plaintiffs seek judgment to reform the notes and mortgages in order to reflect that Bailey is the sole obligor and that the loans are assumable. In addition, Bailey seeks monetary damages as a result of his purported opportunity to sell the mortgaged properties at a favorable price when Metro Federal refused to allow a prospective purchaser to assume the mortgages. In addition, plaintiff Scott J. Pias claims indemnity for any damages he is assessed in a separate lawsuit in which he is a named defendant in his capacity as record owner of one of the three parcels of property at issue.

As receiver for Metro Federal,[2] which is yet undergoing liquidation proceedings, the

---

**1.** For purposes of this ruling, the term "plaintiffs" will include Kathleen Clower Pias, spouse of plaintiff Scott J. Pias, who has been made a counter-defendant to the FSLIC's claims for deficiency judgment on the outstanding promissory notes pursuant to Fed.R.Civ.Pro. 13(h) and 19(a). She has never been made a party plain-

tiff in the proper sense, however, and has not alleged any claim against defendants.

**2.** As "liquidating agent" for Metro Federal, the FSLIC "stands in the shoes of the insolvent bank" and they are treated as one and the same even though the complaint names them as two

FSLIC removed plaintiffs' action from state court pursuant to 12 U.S.C. § 1730(k)(1). Following that removal, the FSLIC filed its answer in which it admitted execution of the notes and mortgages, denied the existence of any oral agreement concerning the counter-letter, asserted a cross-claim against co-defendant Levingston, filed a third-party claim against MGIC Indemnity Corporation, North River Insurance Company, and National Union Fire Insurance Company of Pittsburgh, and furthermore filed a counterclaim against the three plaintiffs, and also against Kathleen Clower Pias pursuant to Federal Rule of Civil Procedure 13(h), for the full amounts due and owing the FSLIC in its capacity as receiver for Metro Federal as the result of their defaults upon the respective promissory notes.

In the FSLIC's third-party complaint, the MGIC Indemnity Corporation was named as a defendant pursuant to a blanket bond which it issued to Metro Federal, providing coverage for losses resulting from certain kinds of acts of Metro Federal's employees. The North River Insurance Company was also named as a third-party defendant as it is alleged to have provided particular insurance coverage to officers, directors, and employees of Metro Federal. In addition, National Union Fire Insurance Company of Pittsburgh was named as a third-party defendant pursuant to its purported professional liability coverage for any act of co-defendant Levingston's professional legal services.

Subsequent to the filing of defendants' answers, plaintiffs amended their complaint to assert a direct cause of action against National Union Fire Insurance Company of Pittsburgh, North River Insurance Company, MGIC Indemnity Corporation, and the Federal Home Loan Bank Board. The MGIC Indemnity Corporation and the Federal Home Loan Bank Board were subsequently dismissed from this action as direct defendants.

In pressing its counterclaim, the FSLIC sets forth sufficient facts to establish that

distinct parties. *See FDIC v. Glickman,* 450 F.2d

the plaintiffs have defaulted in regard to paying the installments due on the notes, that they have failed to pay ad valorem taxes, and that the FSLIC has therefore been properly entitled to have accelerated the notes and have the mortgaged properties seized and sold by executory process. As such, this Court ordered the mortgaged properties be seized by the United States Marshal in preparation for sale in accordance with provisions of the Louisiana Code of Civil Procedure pertaining to executory process. Plaintiffs moved to enjoin the sale of the properties but the motion was denied in accordance with the well established law set forth in the Supreme Court's decision of *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In denying the injunction sought by the plaintiffs, this Court instructed the United States Marshal to sell the three properties "in accordance with their mortgages, after advertisements and formalities, with the sale to be with the benefit of appraisement."

On December 7, 1984, appraisals were submitted as follows on the parcels of property which were to be sold at the Marshal's sale:

Appraisals submitted by counter-claimant, FSLIC—

| | |
|---|---|
| Bailey (Tract 1) | $483,000 |
| Abshire (Tract 2) | $469,000 |
| Pias (Tract 3) | $564,000 |

Appraisals submitted by plaintiffs and counter-defendants—

| | |
|---|---|
| Bailey (Tract 1) | $1,094,400 |
| Abshire (Tract 2) | $ 938,880 |
| Pias (Tract 3) | $ 846,720 |

In view of the substantial discrepancies between the appraisals submitted by the parties, the Court ordered the appointment of a third appraiser whose following evaluations were treated as binding:

| | |
|---|---|
| Bailey (Tract 1) | $398,720 |
| Abshire (Tract 2) | $360,640 |
| Pias (Tract 3) | $360,640 |

Two days after this Court ordered the Marshal's sale, Tower Securities Corporation

416, 418 (9th Cir.1971).

made an offer for the three properties, combined, in the amount of $1.45 million, which offer was rejected by the FSLIC. It also appears that, prior to the Marshal's sale, the FSLIC, through its broker, Century Twenty One Flavin Realty, listed the three properties for sale in the amount of $1.9 million, and thereafter, but also before the Marshal's sale, listed the properties for sale in the amount of $1.5 million. Other offers to buy are alleged to have been made at different times but the Court considers them to be unimportant apart from the fact of showing that various parties did have a particular interest in obtaining the properties.

Approximately two months after this Court required the properties at issue to be sold at public Marshal's sale, the FSLIC entered into a contract with a Mr. Fortune of Baton Rouge whereby it was agreed that if the FSLIC acquired all three tracts of property at the judicial sale, it would resell the three tracts to Fortune as one unit for a total price of $1.1 million. Subsequently, a Mr. Albert Mistretta met with Daniel Flavin, a real estate broker who had been retained by Paul Lancaster, special representative of the FSLIC, and was specifically advised that the FSLIC would bid up the property at the Marshal's sale to $2.2 million. Mistretta was further advised that the FSLIC would not enter into any agreement with him for any post-Marshal's sale purchase of the property because of the FSLIC's "binding contract" with Fortune. Moreover, Mistretta was told that Mr. Fortune had provided the FSLIC with a $25,000 non-returnable deposit in regard to the purchase sale agreement. As a result of the representations of Flavin, Mistretta traveled to Baton Rouge to deal directly with Mr. Fortune rather than make any apparently fruitless bid at the public Marshal's sale. In this vein, Mr. Jerome Johnson, also of Mistretta's group, was also told by Flavin that the property was under contract with Fortune for $1.1 million but that Fortune would be willing to sell it to the Mistretta group for a profit.

From the numerous depositions and affidavits on file, it is clear that the retained broker for the FSLIC, Daniel Flavin, told a number of potential bidders that the FSLIC was going to bid the property up to $2.2 million in order to obtain it for sale to Mr. Fortune in order to support its binding purchase-sale agreement with him and in order to protect its mortgage interests.

After a close and careful review of the affidavits and deposition testimony on file, this Court has no difficulty in finding that, as a matter of fact, the conduct of Daniel Flavin, as retained broker for the FSLIC, had the effect of deterring and discouraging potential purchasers from placing bids at the public Marshal's sale held on February 27, 1985. Obviously, Mr. Fortune was not going to bid at the Marshal's sale after he entered into an agreement to purchase the property from the FSLIC for $1.1 million. Moreover, it is clear that other commercial groups were discouraged from appearing to bid when it was public knowledge that the FSLIC was going to bid the property up to $2.2 million in order to protect their mortgage interests and to support their "binding contract" with Mr. Fortune. Despite the United States Marshal's proper advertising of the property being placed for sale at public auction, the FSLIC was the *only* bidder who appeared at the February 27, 1985 public sale. At that sale, the FSLIC thus acquired all three tracts of land for the minimum allowable bid, i.e., for a total price of $1.1 million.

Further tainting the sale is the fact that Flavin, Lancaster and others had a financial interest in seeing that the property was sold to Fortune in accordance with the terms of the purchase-sale agreement rather than seeing that open and fair bidding was fostered by having Fortune appear at the public sale to purchase the property outright for himself for the price of $1.1 million. As broker for the sale of the property to Mr. Fortune, Flavin was to receive a percentage commission, part of which was to go to Lancaster as "referring agent." Flavin testified at his deposition that there was a total of thirteen percent commissions to be paid on the total sale of

around $1,100,000.00. Flavin Deposition, p. 43.

Following the judicial sale, it appears that Mr. Fortune assigned his rights to a Mr. Robert A. Fuhrman. Both Fortune and Fuhrman have refused to proceed with the purchase pursuant to the agreement previously entered into with the FSLIC, however, and the property as of this date remains unsold in the hands of the FSLIC.

Following these developments, the FSLIC amended its counterclaim so as to seek recovery of the "substantial deficiencies" resulting from the minimal bid made at the judicial sale. As it appears that the plaintiffs are indebted to the FSLIC in excess of $2.1 million, the FSLIC has now moved for summary judgment on the amount of deficiency outstanding. At the same time, however, the plaintiffs have moved for summary judgment dismissing the FSLIC's counterclaim and further seeking affirmative relief as a result of the FSLIC's improper conduct in relation to the judicial sale of February 27, 1985.

## II. APPLICABLE LAW

### A. *Validity of Judicial Sale*

Federal Rule of Civil Procedure 69(a) provides that process to enforce a judgment for the payment of money shall be a writ of execution and must proceed in accordance with the practice and procedure of the state in which this Court is held, excepting that any statute of the United States governs insofar as it may be applicable.[3] In the absence of any applicable federal statute, this Court thus considers the applicable Louisiana statutes and looks to the Louisiana State court decisions construing them. *See* C. Wright & A. Miller, 12 Federal Practice and Procedure § 3012 at p. 66.

The Louisiana Supreme Court has consistently pronounced the following law in regard to the voidability of judicial sales:

One of the objects of sales at public auction is to obtain a fair price for those interested in the proceeds of the property. This is said to be the great object of the rules regulating such sales. Hence the concealment or misrepresentation of facts, amounting to fraud, is not the only cause for annulling a judicial sale, but anything said or done by one who becomes an adjudicatee, for the purpose of preventing competition at the sale, or, in other words, for the purpose of chilling it, which is reasonably capable of doing so, and has that effect, will be sufficient to annul the sale. *Pearlstine v. Mattes,* 223 La. 1032, 67 So.2d 582, 586 n. 3, *citing Swain v. Kirkpatrick Lumber Co.,* 143 La. 30, 78 So. 140 (La.1918); *Konen v. Konen,* 165 La. 288, 115 So. 490, 491 (La.1928).

This view is perfectly consistent with the entirety of common law jurisdictions, that recognize "the law does not tolerate any influence likely to prevent competition in obtaining the approximate value of land." 50 C.J.S. Judicial Sales § 22, at p. 609.

[All] courts are very jealous to insure that nothing is allowed to chill the bidding; and the chilling of bids has often been the ground for vitiating a judicial sale. *Id.* at p. 608.

The FSLIC plainly misinterprets the well-established law, arguing that "Mr. Lancaster's misunderstanding about bidding requirements at a public sale, while unfortunate, does not rise to the level of culpability that will invalidate the sale under those standards established by the jurisprudence. Absent some intentional misconduct by the FSLIC, of which there is no evidence, the Marshal's sale must stand." Post Hearing Memorandum of the FSLIC in Opposition to Plaintiffs' Motion for Summary Judg-

---

**3.** A thorough sampling of United States statutes that serve to displace the executory procedures of the forum state is set forth in C. Wright & A. Miller, 12 Federal Practice and Procedure § 3012 nn. 9–11 and accompanying text. Specific requirements applicable to a judicial sale of realty are set forth at 28 U.S.C. § 2001, but these requirements are inapplicable to the case at bar since it involves a sale and proceeding by the FSLIC in its capacity as receiver for Metro Federal. 28 U.S.C. § 2001(c).

ment, p. 10. The established laws of Louisiana and other jurisdictions clearly set forth that "any misinformation purposely *or mistakenly* given by which bidders are kept from attending or bidding, or any conduct on the part of those actively engaged in the selling or bidding that tends to prevent a fair, free, open sale, or stifle or suppress free competition among bidders, vitiates the sale and constitutes ground for setting it aside on the complaint of the injured person." *Id.* at p. 609 (emphasis added). Moreover, the Louisiana Supreme Court has also recognized that there is *no* requirement of "intentional misconduct" or "culpability" in order to set aside a sale, as the law is meant to "forbid[ ] the stifling of competition among bidders, *irrespective of the cloak under which it is accomplished....*" *Swain v. Kirkpatrick Lumber Co., supra,* 78 So. at 143 (emphasis added). Thus, the intent or "culpability" with which the agents of the FSLIC acted is irrelevant.

■ The mere fact that the conduct of FSLIC's agents in advising the public in general that it would bid up to $2.2 million and that it had a binding contract to sell the properties at issue, which obviously tended to dissuade several potential bidders from attending the Marshal's sale, is sufficient ground for this Court to declare the Marshal's sale of February 27, 1985 a nullity. Certainly, there was no reason for Mr. Fortune to attend the Marshal's sale to bid on the property when he had a binding contract with the FSLIC to purchase it for $1.1 million, especially when an agent of the FSLIC told others that Fortune would sell it to them for a profit! Moreover, the deposition testimony of Mr. Mistretta, Mr. Johnson, Mr. Levingston, and others shows that they as well as the public in general were dissuaded from actively engaging in bidding on the properties and that a fair, free, open sale was stifled as the result of the actions on the part of the FSLIC's agents. A sale which is tainted so much as that in the case at bar must be set aside, and the deed previously issued to the FSLIC by the United States Marshal is held to have passed no title to the property.

**B.** *Remedy for Tainted Judicial Sale*

■ While the plaintiffs seek cancellation of the deficiency on their notes with Metro Federal as a result of the tainted judicial sale, there is no authority which supports this novel proposition. One remedy might consist of awarding the plaintiffs an amount of money to set off against their deficiencies on their notes with Metro Federal: the difference in price between what the public sale would have yielded had it not been tainted and the price that the public sale of February 27, 1985 actually did yield, i.e., $1.1 million. *See Pease v. Gatti,* 205 La. 949, 18 So.2d 511 (1944). Such a remedy is inappropriate in the case at bar, however, because the difference between the price obtained at the tainted sale, which was the minimal and only bid made, and the highest bid price which might have been procured at an untainted sale is necessarily subject to much speculation. *C.f. Pease, id.* (where the amount by which the purchase price was altered was confirmed to have been equal to the specific value of the "kickback" received by the defendant for having manipulated the judicial sale).

Rather than engage in a consideration of the purported assorted offers made to purchase the properties at issue, as well as the widely variant appraisals, the Court finds that a resale of the properties will best serve the interests of both the creditors and the debtors. It has been recognized that a resale is, in fact, the usual manner of rectifying a tainted sale.

While on the setting aside of a judicial sale a court has discretion in ordering or refusing a resale, usually a resale of the property will be ordered whenever the sale is vacated or set aside for any cause that does not involve a want of power in the court to make the sale. A resale may be ordered when a sale is set aside for fraud or misconduct on the part of the purchaser at a judicial sale or some person connected with such sale, even though the alleged fraud is not clearly

established. 50 C.J.S. Judicial Sales § 70(b)(1), at p. 693 (citations omitted). The ordering of a resale likewise serves the public policy of inspiring confidence in court-ordered sales, *see First National Bank of Jefferson Parish v. M/V Lightning Power*, 776 F.2d 1258, 1261 (5th Cir. 1985), and this Court is remiss to allow any effect to be given to a judicial sale conducted by its Order which was tainted by such actions as those described in the above Findings of Fact. In addition, one of the most important factors which the Court considers is the purpose of the judicial sale, which is to benefit both the creditors and debtors. *Id.*

The Court is unable to ascertain how a resale will not serve the best interests of both the creditors and debtors in the case at bar. Despite the fact that the FSLIC had entered into a purchase sale agreement with Mr. Fortune of Baton Rouge, it still retains title to the property and has been unable to effect any sale of it. Thus, any bid by a prospective third-party purchaser at the resale in excess of $1.1 million will certainly benefit the FSLIC, as well as benefit the plaintiffs, whose combined deficiency on all three notes is in excess of one million dollars.

The Court furthermore takes judicial notice of the fact that since the time of the Marshal's sale of February 27, 1985, the U.S. Navy has selected Lake Charles as the homeport for a battleship support group and Boeing Military Airplane Company has recently selected Lake Charles to be the site for its new aircraft maintenance and repair facility. These developments promise the creation of at least seventeen hundred new jobs and have resulted in an upswing of public confidence in the future of the local economy.[4] While these facts will not necessitate higher bids or appraisals on the properties in question, they do lend support to the other compelling factors that indicate a resale will best benefit the creditors and debtors.

The resale is to be conducted in accordance with all the legal formalities of the first sale, i.e., in accordance with their mortgages, after due advertisements and formalities, and with the sale to be with the benefit of appraisement, all in accordance with Louisiana law. *See generally*, La. Rev.Stat. § 13:4101 et seq. Moreover, all mortgagees on the subject properties are to be notified by certified mail of the resale, and this is to include second mortgage holders. The parties are furthermore admonished by the Court not to engage in any activities or agreements which may tend to chill the sale or stifle competition, in order that the best price for the properties can be fairly obtained.

## C. *Defendant's Counterclaim for Deficiency Judgment*

In view of the Court's nullification of the Marshal's sale of February 27, 1985, any resolution of the amount, if any, which will be due and outstanding on the respective promissory notes must await the outcome of the resale. In light of this Court's previous award of summary judgment to the defendants with respect to the plaintiffs' claims for affirmative relief,[5] summary

---

**4.** Federal Rule of Evidence 201(b)(1) provides that the court may take judicial notice of facts "not subject to reasonable dispute" which are "generally known within the territorial jurisdiction of the trial court." This Court invokes this rule herein because these local developments are quite relevant to the benefit hoped to be realized by the parties in the resale. Other courts have deemed such an invocation of F.R.E. 201(b)(1) to be appropriate. In *Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384, 390 (2d Cir.1975), the Court of Appeals took judicial notice of the cost of living in Washington, D.C., for a young lawyer and his law student wife, at least to the extent of concluding that it was error for the trial judge to fix cost of living expenses at $2,750 per year in 1971 as the basis for calculating damages in a wrongful death case. Similarly, in determining the existence of probable cause for an arrest, the Ninth Circuit Court of Appeals took judicial notice that Chico, California is an area in which there are many illegal aliens looking for jobs. *United States v. Tamayo*, 427 F.2d 1072 (9th Cir.1970).

**5.** On March 26, 1986, this Court granted the motion of defendant FSLIC for summary judgment in regard to plaintiffs' stated claims for reformation of the notes and for damages, which claims were based upon the alleged oral agreement between plaintiffs and defendant

judgment should properly be ripe for entry subsequent to fair and proper resolution of the Marshal's resale of the properties at issue.

### D. *Outstanding Causes of Action*

While the principal travel of this case has involved the resolution of the dispute between the FSLIC, as receiver for Metro Federal, and the plaintiffs relative to the promissory notes, which are secured by the properties in question, the action by the plaintiffs against defendant David Levingston and his insurers, National Union Fire Insurance Company of Pittsburgh, and North River Insurance Company, relative to the alleged oral agreement remain unresolved. Once the dispute between plaintiffs and the FSLIC is determined following the Marshal's resale, the issues relative the action against Levingston and his insurers will be far more ripe for adjudication.

### CONCLUSION

In accordance with the foregoing findings of fact and analysis of the applicable law, the plaintiffs' motion for partial summary judgment is GRANTED IN PART insofar as the Marshal's sale of February 27, 1985 is declared to be annulled and that a resale is to be conducted in accordance with the terms of this ruling and the Order of this Court which is issued contemporaneously herewith. Said motion is DENIED in all other respects. The motion of defendant FSLIC for summary judgment on its counterclaim for deficiency judgment as against the plaintiffs and Kathleen Clower Pias is DENIED without prejudice.

### ORDER

IT IS ORDERED, ADJUDGED AND DECREED that the February 27, 1985 judi-cial sale of the following described properties is ANNULLED, that the deed issued pursuant thereto be REVOKED and VACATED, and that the United States Marshal shall immediately resell the following described properties, all to be seized in accordance with the Writ of Seizure and Sale issued this day by this Court, in accordance with their mortgages, after due advertisements and formalities, and with notice by certified mail to be provided all mortgage holders, with the sale to be with the benefit of renewed appraisement, to-wit:

#### TRACT 1—JOHN D. BAILEY—FIRST

Commencing at a point on the South line of Henning Drive, said point being 279.20 feet West of the Northeast Corner of Lot 49, Second Sulphur Farms Subdivision; thence South 0° 13' 42" East 499.41 feet; thence North 85° 35' 15" East 20.41 feet; thence South 6° 59' 00" East 19.50 feet; thence South 30° 27' 55" East 99.93 feet; thence South 1° 54' 29" East 25.40 feet to the North line of Sunset Drive; thence North 89° 49' 04" West along the North line of Sunset Drive 333.34 feet; thence North 0° 58' 53" East 79.16 feet; thence South 89° 10' 06" West 35.05 feet; thence North 0° 36' 20" West 549.10 feet to the South line of Henning Drive; thence North 90° 00' 00" East 706.80 feet along the South line of Henning Drive to the point of commencement, containing 4.36 acres, more or less, together with all additions and improvements thereon.

#### TRACT 2—ROBERT L. ABSHIRE—SECOND

Commencing at the Northeast Corner of Lot 49, Second Subdivision of Sulphur

---

David L. Levingston in his capacity as agent for Metro Federal. Under the clear-cut authority of *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), secret side agreements, such as that allegedly entered into between Levingston and plaintiffs, are of no force or effect as concerns the FSLIC, receiver for Metro Federal. Even before this Court could reach that question as pertains to plaintiffs' claims for affirmative re-lief against the FSLIC, however, the Court was bound to recognize that it is without subject matter jurisdiction over those affirmative claims pursuant to the law enunciated by the Fifth Circuit in *North Mississippi Savings & Loan Association v. Hudspeth*, 756 F.2d 1096 (5th Cir.1985), which recognizes that plaintiffs' sole remedy is to petition the Federal Home Loan Bank Board pursuant to 12 U.S.C. § 1464(d)(6)(C) and 12 U.S.C. § 1729(d).

Farms; thence South 0° 08' 22" East, 629.42 feet to the North line of Sunset Drive; thence North 89° 49' 04" West along the North line of Sunset Drive 205.00 feet; thence North 1° 54' 29" West, 25.40 feet; thence North 30° 27' 55" West, 99.93 feet; thence North 6° 59' 00" West, 19.50 feet; thence South 85° 35' 15" West, 20.41 feet; thence North 0° 13' 42" West, 499.41 feet to the South line of Henning Drive; thence North 90° 00' 00" East along the South line of Henning Drive 279.20 feet to the point of commencement, containing 3.88 acres, more or less, together with all additions and improvements situated thereon.

### TRACT 3—SCOTT J. PIAS and KATHLEEN CLOWER PIAS—THIRD

Commencing at a point on the South line of Henning Drive, said point being 578.51 feet West of the Northeast Corner of Lot 49, Second Sulphur Farms Subdivision; thence go South 0° 36' 20" East, 549.10 feet; thence North 89° 10' 06" East 35.05 feet; thence South 0° 58' 53" East 79.16 feet to the North line of Sunset Drive; thence North 89° 49' 04" West, 168.46 feet; thence North 0° 08' 25" West, 626.2 feet to the South line of Henning Drive; thence North 90° 00' 00" East, 127.79 feet along the South line of Henning Drive, to the point of commencement, containing 1.94 acres, more or less, together with all additions and improvements situated thereon.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that out of the sale proceeds, the Federal Savings and Loan Insurance Corporation as Receiver for Metro Federal Savings and Loan Association of Lake Charles, be paid in accordance with its mortgages on each respective tract in preference to all other creditors as prayed for herein.