Edward KABAKJIAN and
Nancy B. Kabakjian,

v.

UNITED STATES of America, Luann
Parmer, William Snider and
Nancy Snider.

No. Civ.A. 97–5906.

United States District Court,
E.D. Pennsylvania.

April 12, 2000.

Edward Kabakjian, Pennsburg, PA, pro se.

Nancy B. Kabakjian, Pennsburg, PA, pro se.

Melvin E. Newcomer, Lancaster, PA, Charles M. Flesch, Shannon Cohen, Dept. of Justice, Washington, DC, David L. Ashworth, Lancaster, PA, for defendants.

## MEMORANDUM

WALDMAN, District Judge.

### I. *Introduction*

Plaintiffs assert claims for damages against the United States under the Internal Revenue Code, 26 U.S.C. §§ 7433 & 7432, for the allegedly improper tax sale of their property and failure to release tax liens filed by the Internal Revenue Service with two Pennsylvania county prothonotaries.[1]

26 U.S.C. § 7433(a) provides a cause of action for damages to a taxpayer from the reckless, intentional or negligent disregard by any IRS official or employee of any provision of the Internal Revenue Code or regulation promulgated thereunder. "[U]pon a finding of liability," a plaintiff may recover the "actual, direct economic damages sustained by the plaintiff as a proximate result of the reckless or intentional or negligent actions of the [IRS] official or employee" up to $1,000,000 or $100,000 in a case of negligence, plus the costs of the action. *See* 26 U.S.C. § 7433(b).[2] 26 U.S.C. § 7432(a) provides a cause of action for damages resulting from the knowing or negligent failure of an IRS official or employee to release a lien on a taxpayer's property. "[U]pon a finding of liability," the taxpayer may recover any "actual, direct economic damages" which "but for the actions of the defendant, would not have been sustained," plus the costs of the action. *See* 26 U.S.C. § 7432(b).

Plaintiffs seek to recover pursuant to § 7433 the difference between the amount realized from the tax sale and the amount they allege their property was worth plus lost rental income. Plaintiffs' claim for damages under § 7432 is predicated on a denial of their application for a platinum mastercard, allegedly because of the liens.

The court has original jurisdiction over these claims pursuant to 28 U.S.C. § 1331.[3] Presently before the court is the motion of the United States for summary judgment.

### II. *Legal Standard*

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Arnold*

---

1. Plaintiffs actually cite to 26 U.S.C. § 7431 which addresses unauthorized disclosure of tax records. As plaintiffs seek damages for failure to release tax liens, the court assumes their claim is predicated on § 7432.

2. 26 U.S.C. § 7433 was amended effective July 22, 1998 to provide liability for "negligent" conduct. *See* Internal Revenue Service Restructuring and Reform Act of 1998 § 3102, Pub.L.No. 105–206, 112 Stat. 685. The amendments to § 7433 are not retroactive. *See id.* § 3102(d), Pub.L.No. 105–206, 112 Stat. 685, 731 ("amendments made by this section shall apply to actions of officers or employees of the Internal Revenue Service after the date of the enactment of this Act").

3. Plaintiffs also have an outstanding equitable quiet title claim against the individual defendants who purchased the property at the tax sale in question. Plaintiffs have not alleged diversity of citizenship or identified any right owed to them by the purchasers under federal law. Plaintiffs have asserted supplemental jurisdiction for this claim pursuant to 28 U.S.C. § 1367(a).

*Pontiac–GMC, Inc. v. General Motors Corp.,* 786 F.2d 564, 568 (3d Cir.1986). Only facts that may affect the outcome of a case are "material." *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. All reasonable inferences from the record must be drawn in favor of the non-movant. *See id.* at 256, 106 S.Ct. 2505.

Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. *See J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir. 1990) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). A plaintiff cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which the fact-finder could reasonably find in his favor. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Ridgewood Bd. of Educ. v. N.E. for M.E.,* 172 F.3d 238, 252 (3d Cir. 1999); *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989); *Woods v. Bentsen,* 889 F.Supp. 179, 184 (E.D.Pa.1995).

### III. *Facts*

From the competent evidence of record, as uncontroverted or otherwise taken in the light most favorable to plaintiffs, the pertinent facts are as follow.

On December 17, 1995, the Internal Revenue Service ("IRS") seized plaintiffs' property at 1730 Valley Forge Road, Lancaster, Pennsylvania for failure to pay taxes. On February 23, 1996, the IRS sold the real property to defendants William and Nancy Snider and LuAnn Palmer as the highest bidders in a public sealed bid sale. The IRS issued a deed conveying title to the purchasers on September 18, 1996, following the expiration of the 180 day redemption period.

On October 5, 1995, Revenue Officer Chesna White estimated the value of plaintiffs' property at $100,000 based on an external viewing during a drive-by. By December 4, 1995, Ms. White had determined a market value of $80,000 on IRS Form 2433. Using the IRS Minimum Bid Worksheet, Form 4585, Officer White then established a reduced forced sale value of $48,000 and a minimum bid price of $36,-178.33. The reduction from $80,000 to $48,000 reflects adjustments within IRS guidelines for the forced nature of the sale and marketability factors specific to the county of sale. The minimum bid price was dictated by a provision in the IRS manual which sets a ceiling for a minimum bid at the sum of the tax owed, interest, penalties and expenses of sale. The Minimum Bid Worksheet prepared by Officer White was reviewed and approved by an IRS Group Manager.

On December 11, 1995, Ms. White sent notice of levy, notice of seizure and a copy of the Minimum Bid Worksheet by certified mail to plaintiffs at their personal residence at 1730 Fels Road, Pennsburg, Pennsylvania. On January 24, 1996, she sent notice of the sale by certified mail. On January 29, 1996, she posted public notice of the sale at the Lancaster County Post Office and at the place of sale and mailed notice to real estate agents and individuals on the bidding list. On February 1, 1996, she posted notice on the seized property. On February 8, 1996 notice of the sale was published in an area newspaper.

Plaintiffs' usual place of abode was within the internal revenue district where the seizure and sale of the property occurred. The IRS neither served plaintiffs in person with written notice of the seizure and sale nor left such notice at their usual abode. Plaintiffs do not dispute that they timely received actual notice of the seizure and sale via certified mail for which receipts were signed on December 15, 1995 and January 27, 1996 respectively.[4]

---

4. Indeed, Mr. Kabakjian sent letters to Officer White on December 15, 1995 and January 30, 1996 in which he specifically refers to the

notices. He stated that "[i]t is not my intention to pay back taxes, alleged or real, with

In October 1992, September 1995 and December 1995, the IRS had filed Notices of Federal Tax Lien with the Lancaster and Bucks County prothonotaries referring to plaintiffs' tax liabilities for the years 1987, 1988, 1989 and 1993.[5]

The property was sold for $65,509 of which $38,050.19 was applied to plaintiffs' tax liability, leaving a surplus of $27,458.81. Because the IRS believed that plaintiffs may have had other tax debts at the time the property was sold, it did not provide a refund to plaintiff from the sale until October 19, 1998.

On May 15, 1997, plaintiffs filed an administrative claim for damages pursuant to Treasury Regulation 26 C.F.R. § 301.7432–1. Although they had not previously filed a proper request for certificate of release of lien pursuant to Treasury Regulation 26 C.F.R. § 401.6325–1(f), they included such a request with their administrative claim. By letter of May 21, 1998, Department of Justice attorney Shannon Cohen advised IRS District Counsel H. Stephen Kesselman that plaintiffs' claim to excess proceeds from the sale appeared valid and recommended that any true surplus be refunded and any corresponding liens be released immediately. The IRS refunded the surplus on October 19, 1998 and released the liens on November 2, 1998.

Plaintiffs received the refund check for $33,445.85, representing the surplus plus interest. They have refused to cash the check, however, as part of their continuing "protest" against the IRS.[6]

In response to a solicitation or "invitation" from MBNA America Bank, Mr. Ka-

bakjian applied for a platinum mastercard in 1996 or early 1997. He was advised by correspondence of February 20, 1997 from a bank employee that his application could not be approved because he "did not meet the eligibility conditions stated in [his] invitation" as it appeared from a credit report that there were "liens or judgments against [him]." The letter continued that the bank nevertheless "attempted to qualify [his] application on a non-preapproved basis" but determined he was ineligible because of "a history of delinquency with [his] creditors."

As a result of the denial of this credit card, plaintiffs were unable to take advantage of travel opportunities presented "on two occasions" in telephone solicitations from a travel agency in Ft. Lauderdale sometime between February 1996 and February 1997.[7] With each solicitation, plaintiffs were offered vacation packages to several different destinations including Ft. Lauderdale, the Bahamas and Brandon, Michigan. Mr. Kabakjian acknowledged that he could afford to pay cash for these trips but that the travel agency required him to provide a credit card number immediately over the telephone to book them. He acknowledged traveling to "a variety of places" during this period, including Florida and Brandon, Michigan. On some of those trips plaintiffs "piggybacked" on relatives' credit cards and then paid them back in cash.

## IV. *Discussion*

### A. *Section 7433 Claim*

Plaintiffs assert that the IRS disregarded the notice provisions of 26 U.S.C.

---

real estate or any form of personal property" other than "Federal Reserve Notes."

**5.** It appears that in 1997 and 1998 the IRS issued requests for payment of taxes to plaintiffs owed for other years including 1992, 1994 and 1995. The property sale at issue in the instant case, however, was based only on tax liability for the years referenced in the liens.

**6.** Plaintiffs do not quarrel with the government's characterization of them as "tax pro-

testers." For many years they have filed tax returns in blank except to note the non-applicability ("N/A") of each referenced item of income. In written communications to the IRS, Mr. Kabakjian has asserted that the agency "has no jurisdiction outside the territorially limited areas cited in the Constitution" and thus no authority to assess tax liability against citizens of the states.

**7.** At his deposition on February 1, 1999, Mr. Kabakjian testified that the solicitations had been made "two to three years" earlier.

§ 6335(a) & (b) when the agency provided notice of the seizure and sale respectively by certified mail rather than personal delivery as prescribed when the property owner has a dwelling or business within the internal revenue district where the seizure occurs.[8]

■ Plaintiffs also assert that "Officer White intentionally violated the minimum price provision of § 6335(e) by knowingly understating the property value on the Minimum Bid Worksheet." The short answer to this contention is that § 6335(e) requires only that a minimum price be set and that no lower bid be accepted. It does not require the IRS to determine fair market value or to base the minimum bid price on such value. As noted, the minimum bid is capped at the sum of taxes owed, interest, penalties and expenses of sale.

If plaintiffs meant to allege that the minimum bid is low in relation to the market value, the short answer is that there is a difference between the minimum bid and sale price. Plaintiffs' property was sold for almost twice the minimum bid price. If plaintiffs meant to allege that the sale price was low in relation to the market value, the short answer is that this would ignore the context in which the sale was made. It is clear that the forced sale value of property will almost invariably be significantly less than the ordinary fair market value. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537–38, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (noting that fair market value is the "very antithesis of forced sale value" because it presumes market conditions which by definition do not exist).

Plaintiffs rely on *Ringer v. Basile*, 645 F.Supp. 1517 (D.Colo.1986) to argue that nevertheless relief is available when the price obtained in a forced sale is not "within the ball park of reason." The Court in *Ringer* appears to have read into § 6335(e) additional limitations based on common law principles to recognize a claim for "inequitable conveyance" predicated on the selling price of the seized property. In denying a motion to dismiss, the Court held that it could set aside a federal tax sale pursuant to 28 U.S.C. § 2410 if evidence established that the price realized was so "grossly disproportionate" to the fair market value as to "shock the judicial conscience." *Id.* at 1522.

This standard was derived from cases involving mortgage foreclosures and confirmations of judicial sales going back to a 93 year old Supreme Court case in which the Court stated that such a sale "will not be set aside for mere inadequacy of price unless that inadequacy be so gross as to shock the conscience." *Ballentyne v. Smith*, 205 U.S. 285, 290, 27 S.Ct. 527, 51 L.Ed. 803 (1907). In *Ballentyne*, the Court upheld the setting aside of the foreclosure sale of property "worth at least seven times [85%] more" than the highest bid. *Id.* at 291, 27 S.Ct. 527. *See also Jefferson Bank & Trust Co. v. Van Niman*, 722 F.2d 251, 252 (5th Cir.1984) (stating that judicial sale of vessel foreclosed by mortgagee for 1/2% of value "would be a grossly inadequate price, shocking to the conscience").[9]

---

**8.** Literally reciting the language of each subsection of the statute, plaintiffs also alleged that the IRS failed to comply with virtually every requirement of § 6335. Whether in an effort to comply with Fed.R.Civ.P. 11(b)(3) or otherwise, in their response to the instant motion plaintiffs press only their contention regarding notice and an argument about the adequacy of the sale price. Nevertheless, the court has considered all of the failures alleged in the complaint. It clearly appears from uncontroverted evidence of record that the IRS literally complied with each requirement of § 6335 other than the notice provisions of subsections (a) and (b).

**9.** In the case of a judicial sale, "the seller is the court itself." *First National Bank of Jefferson Parish v. M/V Lightning Power*, 776 F.2d 1258, 1261 (5th Cir.1985). The purpose generally is to maximize a return for creditors and to relieve the debtor of as much debt as practicable. It follows that a court would reasonably assert itself on the question of the adequacy of the sale price. *See id.* at 1259 (sale price of 1% of market value so grossly disproportionate confirmation should have been withheld at least pending determination of its affect on rights of third party lienholders). The only federal tax case relied on by the Court in *Ringer* involved the sale of property under court order in proceedings to fore-

■ Significantly, the taxpayer in *Ringer* alleged that she received no notice at all of the sale until after it was executed. This alone stated a claim sufficient to withstand the motion to dismiss. *See Ringer*, 645 F.Supp. at 1525.[10]

■ Even assuming that one may reasonably import into the minimum bid requirement of § 6335(e) an obligation not to sell property seized for collection of taxes at a price so below market value as to shock the conscience, there is no competent evidence of record from which one reasonably could find this happened to plaintiffs in the instant case. The sale price in *Ringer* was barely 4% of market value. The Court in *Ringer* made clear that an "inadequate" or even "very low" price will not support relief unless it is so low as to be in "the realm of outrageousness." *Id.* at 1522. The Court, and indeed the plaintiff, in *Ringer* did not question "the Secretary's right to set a minimum bid price far below the fair market value." *Id.* at 1519. *See also Latvian Shipping Co. v. Baltic Shipping Co.*, 99 F.3d 690, 694 (5th Cir.1996) (judicial sale price of 42.5% of market value not so grossly inadequate as to shock conscience).

Plaintiffs' property was sold for more than 80% of the market value determined by the IRS and 65% of the initial estimate of Revenue Office White at the time of her visual inspection. Indeed, it was sold for 47.5% of plaintiffs' own unsupported estimate of market value. One could not find from the competent evidence of record in this case a disparity so gross as to shock the conscience.

The requirements for notice of seizure of property by the IRS are set forth in the Internal Revenue Code as follows:

As soon as practicable after seizure of property, notice in writing shall be given by the Secretary to the owner of the property ... or shall be left at his usual place or abode or business if he has such within the internal revenue district where the seizure is made. If the owner cannot be readily located, or has no dwelling or place of business within such district, the notice may be mailed to his last known address.

26 U.S.C. § 6335(a). The Code provides the same procedures for notice to the property owner of the sale. *See* 26 U.S.C. § 6335(b). Plaintiffs argue that these requirements were violated when notice was provided to them by certified mail since they had a dwelling and could have been located within the revenue district.

■ The failure to provide notice to a delinquent taxpayer of a seizure and sale of his property would constitute a substantial defect. The provision for personal delivery of a notice to a taxpayer resident in

---

close tax liens. *See U.S. v. Howard*, 296 F.Supp. 264 (D.Or.1968). The Court in that case actually stated that to collaterally attack the sale, the taxpayer had to show "the sales price was so inadequate as to amount to fraud." *Id.* at 265.

**10.** The Court in *Ringer* rejected any claim for money damages against the United States for losses resulting from the tax sale. *Id.* at 1526. Sections 7432 and 7433 had not been enacted. The Court did state that the plaintiff in *Ringer* could assert a *Bivens* claims for damages against IRS officials individually for any unconstitutional conduct on their part. *Id.* at 1526–27. If the Court in *Ringer* was suggesting that statutory requirements aside, the permanent deprivation of property by government action which shocks the conscience may violate the substantive due process rights of

the person so deprived, this court agrees. The remedy in the tax sale context, however, would be an action under 28 U.S.C. § 2410 to set aside the sale within the redemption period or while the government otherwise retains an interest in the property. "Because Congress has provided explicit statutory remedies for improper conduct during the assessment and collection of income taxes, a *Bivens* claim cannot be maintained against IRS employees and agents." *Barnard v. Pavlish*, 1998 WL 247768, *8 (M.D.Pa. Mar.30, 1998), *aff'd*, 187 F.3d 625 (3d Cir.1999). *See also Dahn v. U.S.*, 127 F.3d 1249, 1254 (10th Cir.1997) ("individual agents of the IRS are not subject to *Bivens* actions" on claims related to tax disputes); *Wages v. IRS*, 915 F.2d 1230, 1235 (9th Cir.1990); *Lang v. Rubin*, 73 F.Supp.2d 448, 452 (D.N.J.1999).

the revenue district, however, is not itself a substantive end. The requirement no doubt reflects a judgment that personal delivery best ensures actual notice and thus should be employed when practicable. Where, however, timely notice is provided and actually received by certified mail, the purpose of the notification requirement has been satisfied. *See Kaggen v. IRS,* 71 F.3d 1018, 1022 (2d Cir.1995) (where taxpayer timely receives actual notice of seizure of property although not in specified manner, "the requirements of § 6335(a) have been fulfilled"); *Olson v. U.S.,* 1990 WL 132474, *3 (W.D.Pa. July 5, 1990) (noting reason for hand delivery requirement is to ensure actual notice and characterizing use of certified mail as "technical failure"); *Person v. U.S.,* 1990 WL 107423, *3 (D.Haw. June 11, 1990) (where mailing to post office box resulted in "actual notice without prejudicial delay," failure of IRS literally to comply with service requirements of § 6331(d) regarding notice of levy not actionable under § 7433 as disregard of a Code provision).

The court does not suggest that the IRS or any government agency should make less than every effort to comply literally with all procedural as well as substantive legal requirements. Whenever the IRS fails to comply with §§ 6335(a) & (b), it assumes a risk that the tax collection process will be frustrated at some cost in effort and public funds if the agency cannot prove timely notice was actually received. It will be a rare case, however, in which a taxpayer who did timely receive actual notice can establish damages as a proximate result of the failure strictly to comply with the prescribed mode of service.

■ As noted, § 7433(b) limits damages to "actual, direct economic damages" incurred by the plaintiff "as a proximate result" of the disregard by an IRS employee of a Code provision or regulation. It is uncontroverted that plaintiffs received actual notice of the seizure and sale by certified mail within the time required by law. One cannot reasonably find on this record

that plaintiffs would have been any better positioned to contest their tax liability, redeem their property or otherwise challenge the seizure or sale of that property if the IRS had provided notice by personal delivery. One cannot reasonably find from the competent evidence of record that plaintiffs sustained any economic damages proximately resulting from service by certified mail.

## B. *Section 7432 Claim*

As a threshold matter, the government contends that plaintiffs failed to exhaust administrative remedies as required to maintain a § 7432 claim. Plaintiffs respond that they exhausted their administrative remedies by making a proper request for a certificate of release of lien at the time they filed their administrative claim for damages.

■ Section 7432(d)(1) imposes a requirement of exhaustion of administrative remedies. Exhaustion of the corresponding administrative remedies specified in 26 C.F.R. § 301.7432–1(f) is jurisdictional. *See Venen v. United States,* 38 F.3d 100, 103 (3d Cir.1994).

The Internal Revenue Code provides in pertinent part that:

Subject to such regulations as the Secretary may prescribe, the Secretary shall issue a certificate of release of any lien imposed with respect to any internal revenue tax not later than 30 days after the day on which [he] finds that the liability for the amount assessed, together with all interest in respect thereof, has been fully satisfied or has become legally unenforceable.

26 U.S.C. § 6325(a).

The thirty day period within which the IRS must release a lien commences upon a finding or action by the Secretary. "It is the IRS, not the taxpayer, who must make the determination required by section 6325." *Husek v. Internal Revenue Service,* 778 F.Supp. 598, 605 (N.D.N.Y.1991). Treasury Regulations provide that a find-

ing will be deemed to have been made based upon either an actual finding of full satisfaction or legal unenforceability or a request for a certificate of release of lien which meets requirements set forth in the regulations.

The regulations provide in pertinent part that:

> For purposes of this section, a finding under section 6325(a)(1) that the liability ... has been fully satisfied or has become legally unenforceable is treated as made on the earlier of:
>
> (1) [t]he date on which the district director of the district in which the taxpayer currently resides or the district in which the lien was filed finds full satisfaction or legal unenforceability; or
>
> (2) [t]he date on which such district director receives a request for a certificate of release of lien in accordance with § 401.6325–1(f), together with any information which is reasonably necessary for the district director to conclude that the lien has been fully satisfied or is legally unenforceable.

26 C.F.R. § 301.7432–1(b).

> A request for a certificate of release with respect to a notice of Federal tax lien shall be submitted in writing to the district director (marked for the attention of the Chief, Special Procedures Function) of the district in which the notice of Federal tax lien was filed. The request shall contain the following -
>
> (1) Name and address of the taxpayer;
>
> (2) A copy of the notice of Federal tax lien affecting the property; and
>
> (3) The grounds upon which the issuance of a release is sought.

Treasury Regulation § 401.6325–1(f).

Prior to filing a § 7432 claim, a taxpayer must submit to the IRS an administrative claim for damages. The administrative claim must be sent in writing to the district director (marked for the attention of the Chief, Special Procedures Function) in the district in which the taxpayer resides or the district in which the notice of federal tax lien was filed. The request must

include the taxpayer's identifying information (including addresses, phone numbers with times to be contacted, and taxpayer identification number); a copy of the notice of federal tax lien affecting the property; a copy of the request for release of lien made in accordance with § 401.6325–1(f), if applicable; the grounds for the claim (including substantiation); a description of the injuries incurred; the dollar amount of the claim; and, the signature of the taxpayer or duly authorized representative. *See* 26 C.F.R. § 301.7432–1(f); *Venen*, 38 F.3d at 103.

Because plaintiffs simultaneously filed a request for release of lien and an administrative claim for damages, the government argues they failed to file a proper request for certificate of release "prior" to filing their administrative claim for damages. As such, the government argues plaintiffs failed to exhaust their administrative remedies because their administrative claim for damages did not literally include a copy of a request for a certificate of release filed in accordance with § 401.6325–1(f).

The standard for taxpayer compliance with the statutory and regulatory requirements is high. *See Venen*, 38 F.3d at 103 (failure to petition IRS correctly constitutes failure to exhaust administrative remedies); *Amwest Surety Ins. Co. v. United States*, 28 F.3d 690, 696 (7th Cir. 1994) (recognizing harsh result but holding that taxpayer who addressed letter to revenue officer rather than district director as required by regulation failed to petition IRS correctly and thus failed to exhaust administrative remedies); *Veglia v. United States*, 1996 WL 392159, *3–4 (N.D.Ill. July 11, 1996) (failure to comply strictly with guidelines for filing administrative claim constitutes failure to exhaust administrative remedies).

The standard is exacting but not mindless. The purpose is to ensure that the government has an opportunity to remedy any error prior to being subject to the burden of litigation over matters which could have been resolved efficiently had

the government been properly made aware of a mistake. *See id.*

■ Plaintiffs filed a request for release of lien simultaneously with an administrative claim for damages. They then waited 125 days before filing suit. Treasury Regulations only require a taxpayer to wait thirty days after filing an administrative claim to initiate a civil action. *See* 26 C.F.R. § 301.7432–1(e)(1)(ii). Neither the statute nor applicable regulations specify any period of time a taxpayer must wait after filing a request for a certificate of release of a tax lien to submit an administrative claim for damages.

It is clear that the government had ample opportunity to review the request and to release the lien or to decline to do so and address the administrative claim. At least in the circumstances of this case, the simultaneous filing of the request for a certificate of release of lien and the administrative claim comports sufficiently with the language and purpose of the statute and regulations as to constitute exhaustion of administrative remedies.

The government also argues that plaintiffs have failed to produce sufficient evidence to show that the IRS knowingly or negligently failed to release the tax liens at issue.

The Treasury Regulations set forth the requirements for release of a tax lien in pertinent part as follow:

(a) The district director shall issue a certificate of release for a filed notice of Federal tax lien not later than 30 days after the date on which the district director finds that the entire tax liability listed in such notice of Federal tax lien has been fully satisfied (as defined in paragraph (c) of this section) or has become legally unenforceable.

.　　.　　.　　.　　.

(c) Satisfaction of tax liability. For purposes of paragraph (a) of this section, satisfaction of the tax liability occurs when—

(1) The district director determines that the entire tax liability listed in a notice of Federal tax lien has been fully satisfied. Such determination will be made as soon as practicable after tender of payment

§ 401.6325–1(a), (c)(1). A finding of full satisfaction is treated as made on the earlier of:

(1) The date on which the district director of the district in which the taxpayer currently resides or the district in which the lien was filed finds full satisfaction or legal unenforceability; or

(2) The date on which such district director receives a request for a certificate of release of lien in accordance with § 401.6325–1(f), together with any information which is reasonably necessary for the district director to conclude that the lien has been fully satisfied or is legally unenforceable.

26 C.F.R. § 301.7432–1(b).

Plaintiffs submitted a proper request for a certificate of release of lien on May 15, 1997.[11] The district director is on constructive notice of information provided in a request for a certificate of release of lien. *See Steffen v. U.S.*, 952 F.Supp. 779, 783 (M.D.Fla.1997) (taxpayer may show IRS knew or should have known liability was satisfied "at the time [he] requested release of federal tax lien" by showing facts provided in request gave IRS "constructive knowledge" of satisfaction). Pursuant to the regulations, the IRS should have released the liens by June 14, 1997. The liens were not released, however, for more than thirty-two months after the sale of plaintiffs' property, more than seventeen months after plaintiffs submitted a proper request for release of lien and more than five months after a Department of Justice attorney advised the IRS District Counsel

---

**11.** IRS records include entries for additional interest charges and penalties following February 23, 1996. The government, however, has not challenged plaintiffs' assertion that the proceeds from the February 1996 property sale satisfied the tax liabilities for which the liens at issue were filed.

that the liens should be released. One reasonably could find that the IRS knowingly or negligently failed to release the tax liens within the meaning of § 7432.[12]

The government ultimately argues that in any event plaintiffs have failed to substantiate any "actual, direct economic damages" resulting from the failure timely to release the liens.

■ From the competent evidence of record regarding damages, one can find nothing more than the denial of a credit card on February 20, 1997 which resulted in plaintiffs' inability to take advantage of two telephone solicitations for vacation packages which could be booked only be persons immediately providing a credit card number to the solicitor.[13]

■ Plaintiffs bear the burden of proving causation. *See Information Resources, Inc. v. U.S.*, 996 F.2d 780, 784–85 (5th Cir.1993) (testimony of prospective customer's CFO that knowledge of tax lien was "one of the reasons" for deciding not to give profitable contract to plaintiff insufficient to establish that contract would have been awarded "but for" tax lien). *See also Jones v. U.S.*, 9 F.Supp.2d 1119, 1137 (D.Neb.1998) (discussing need to prove causation in context of § 7431 claim for unauthorized disclosure of tax return information).

■ In the instant case, one is left to speculate about causation. It appears that MBNA's pre-approval of a credit card was conditioned on the absence of any lien. It also appears, however, that a credit card was ultimately denied in part because of "a history of delinquency" with "creditors" in the plural. It is also far from clear that the presence on a credit report even of a recently discharged lien or recently satisfied delinquent debt would not affect one's eligibility for an MBNA credit card. Also, of course, insofar as the IRS was not required to release the lien under applicable law until June 14, 1997, the denial of a credit card on February 20, 1997 would not have resulted from an improper failure to release a lien. Even accepting that the only creditor with whom plaintiffs were ever delinquent was the United States, that their request for a credit card was an open or continuing one and that MBNA would be undeterred by a recently satisfied delinquent tax debt, plaintiffs have not established "actual, direct economic damages."

Although it may cause non-economic harm such as humiliation or mental distress, the denial of credit and of a particular vacation opportunity do not alone constitute economic damages. *See Stevenson v. TRW, Inc.*, 987 F.2d 288, 296–97 (5th Cir.1993) (because "actual" damages provided by Fair Credit Reporting Act are not limited to economic losses, recovery available for mental distress caused by denial of credit); *Pinner v. Schmidt*, 805 F.2d 1258, 1265 (5th Cir.1986) (although "plaintiff produced no evidence of any monetary damages" in FCRA case, plaintiff's evidence sufficient to support award of some measure of damages for embarrassment caused by denial of credit); *James v. Coors Brewing Co.*, 73 F.Supp.2d 1250, 1253 (D.Colo.1999) (loss of reputation resulting in injury to credit standing is neither monetary nor financial in nature absent evidence of some resulting economic loss); *Jones*, 9 F.Supp.2d at 1149 (noting that unlike "actual, direct economic damages" specified in §§ 7432 & 7433, "actual damages" provided in § 7431 include more than "out-of-pocket" or "pecuniary" losses).

---

12. The IRS reasonably could have believed that taxpayers who routinely file blank tax returns and dispute the right of the agency to collect taxes from them would have further tax liability. Upon satisfaction of tax liability assessed for the year or years referenced in a lien, however, that lien should be released.

13. There is no testimony or allegation in the complaint that plaintiffs suffered any embarrassment or mental anguish. Even if some measure of embarrassment and mental stress may be reasonably inferred, these types of damages are not direct economic losses and thus not compensable under § 7432.

"[A] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied. Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). *See also United States v. Nordic Village, Inc.,* 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (waiver not to be "enlarged beyond what the language requires"). When strictly construed, the term "actual, direct economic damages" does not encompass the mere denial of a credit card and the resulting loss of particular vacation opportunities.

While the denial of a credit card may result in an inability to purchase something of appreciating value or to acquire something with which one could derive income or to transfer debt to a card with a lower interest rate, there is no competent evidence of record from which one reasonably could find that the denial of a credit card to plaintiffs in this instance resulted in anything other than embarrassment, inconvenience and feelings of disappointment. *See Katz v. Dime Sav. Bank, FSB,* 992 F.Supp. 250, 257 (W.D.N.Y.1997) (claim cannot survive summary judgment "merely by listing economic harm that might have occurred as a result of defendants' conduct").

## V. *Conclusion*

Plaintiffs timely received actual notice of the seizure and sale of their property and have presented no competent evidence from which one reasonably could find they sustained any direct economic damages as a proximate result of receiving that notice by certified mail. Even assuming that plaintiffs would have received an MBNA credit card "but for" the failure timely to release the liens on their property, they have not presented any competent evidence that this entailed any "actual direct economic damages."[14] Accordingly, the government is entitled to summary judgment on the pending claims against it.

The elimination of all federal claims before trial weighs heavily in favor of declining to exercise supplemental jurisdiction over remaining state law claims. *See Sullivan v. Conway,* 157 F.3d 1092, 1095 (7th Cir.1998); *McClelland v. Gronwaldt,* 155 F.3d 507, 520 (5th Cir.1998); *Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995). The remaining dispute among Pennsylvania citizens regarding title to real property in Pennsylvania is best resolved by the state courts and the parties have offered no affirmative justification for exercising federal supplemental jurisdiction over it. Accordingly, the remaining state law claim will be dismissed pursuant to 28 U.S.C. § 1367(c)(3), without prejudice to plaintiffs to reassert such a claim in any appropriate state court consistent with 28 U.S.C. § 1367(d) and with the good faith requirement of Pa. R.Civ.P. 1023(b).

An appropriate order will be entered.

## ORDER

**AND NOW,** this ___ day of April, 2000, upon consideration of the Motion of defendant United States for Summary Judgment (Doc. # 30) and plaintiff's response thereto, consistent with the accompanying memorandum, **IT IS HEREBY ORDERED** that said Motion is **GRANTED** and accordingly **JUDGMENT is ENTERED** in the above action for the United States and against plaintiffs on all of their pending claims against the United States herein; and, pursuant to 28 U.S.C. § 1367(c)(3), plaintiffs' remaining state law claim against defendants Luann Parmer, William Snider and Nancy Snider is **DISMISSED** without prejudice to assert such claim in an appropriate state court consis-

---

14. As plaintiffs have not sustained a claim under § 7433 or § 7432 and have not obtained "a finding of liability," they also are not entitled to costs in this action.

tent with 28 U.S.C. § 1367(d) and applicable state rules of procedure.